[No. B046862. Second Dist., Div. Seven. Dec. 9, 1991.]

PATRICIA DOUGLAS et al., Plaintiffs and Respondents, v.
ANTON OSTERMEIER et al., Defendants and Appellants.

**COUNSEL**

James P. Montague for Defendants and Appellants.

Huey P. Shepard for Plaintiffs and Respondents.

## OPINION

**JOHNSON, J.**—Appellants, Anton Ostermeier and West Coast Car Sales, appeal from a judgment entered on a jury verdict awarding respondents rescission on a car sales contract of $24,354 and awarding compensatory damages of $10,624 on the fraud cause of action as well as $187,000 in punitive damages. Appellants attack the amount of punitive damages as excessive as a matter of law. They also contend the punitive damage award is a result of passion and prejudice created by the improper expert testimony concerning the value of appellants' property by respondent Patricia Douglas.

During the pendency of this appeal, the California Supreme Court decided *Adams* v. *Murakami* (1991) 54 Cal.3d 105 [284 Cal.Rptr. 318, 813 P.2d 1348], which determined a plaintiff must present evidence of a defendant's financial condition as a prerequisite to an award of punitive damages. We conclude principles of fairness and public policy do not compel the conclusion the decision should be given only prospective effect and apply this new requirement to the case at bar. However, we further conclude adequate evidence of appellants' financial condition was presented at trial to substantiate the jury's award of punitive damages. We consequently affirm the judgment.

### FACTS AND PROCEEDINGS BELOW

In July 1983 respondents, Patricia and Michael Douglas, decided to buy a new car. They originally intended to purchase a new diesel automobile but a friend suggested looking at used Mercedes automobiles at West Coast Car Sales. This friend had purchased a used Mercedes from appellants for what she believed was a reasonable price.

Patricia Douglas visited West Coast Car Sales, a business wholly owned by Ostermeier. She saw a diesel Mercedes for sale but also saw a 450 SLC model Mercedes which interested her more because of its style and sportiness. Each time she visited West Coast Car Sales there were about 10 cars with "for sale" signs on the parking lot.

Approximately one week later, respondents again visited West Coast Car Sales and met with Ostermeier to discuss purchasing the 450 SLC. Ostermeier stated the car was a 1978 model worth $29,000. The parties negotiated price and extras and respondents ultimately agreed to purchase the car for $22,500 plus tax, registration and license fees with upgraded wheels and a general three-month warranty on the car.

The Douglases returned the next day to pay for the car and to sign documents. The following day the car would not start and it had to be towed for repairs.

On May 1, 1984, representatives of the California Highway Patrol (CHP) went to the Douglas residence and impounded the car. A CHP officer showed Patricia a photograph of a totally wrecked car with the fatally injured driver still in the driver's seat. The officer explained he had reason to believe her car was the same as depicted in the photograph and was concerned her car might be stolen. The car remained impounded for approximately a month. The CHP determined the car had not been stolen but when it was returned to the Douglases the CHP required it be reregistered as a 1973 vehicle. Sometime after the CHP returned the car, the front frame of the car broke off and the car had to be towed and repaired. At some point Patricia Douglas permanently parked the car in their garage at home.

Apparently, Ostermeier had purchased two totally wrecked "salvage" cars. He purchased the 1978 450 SLC Mercedes which had been in a car accident. From another auto wrecking facility he purchased the frame of a 1973 Mercedes which had been gutted by fire. From these two cars Ostermeier created the composite 450 SLC sold to the Douglases.

When Ostermeier purchased the two wrecks he received "pink slips" indicating their respective vehicle identification numbers (VIN). He reregistered these two cars with the Department of Motor Vehicles (DMV) as "salvage" automobiles. This reregistration triggered the attention of the CHP who regularly monitor the switching or disguising of VIN numbers for the purpose of switching high priced vehicles for salvage. In this case the reregistration led the CHP to investigate the Douglases' car.

The CHP investigation revealed VIN numbers of the 1973 Mercedes frame had either been filed off or had been covered over by a new VIN plate indicating a year and model of a 1978 Mercedes. Alteration of any VIN number is a criminal offense. The officer testified he had personally warned Ostermeier on a prior occasion to cease tampering with official identifications of cars he restored. In this case Ostermeier claimed he received the 1973 frame with the VIN numbers already obliterated. He testified that because he could no longer read the numbers and, because he could not be sure of the correct VIN number for the 1973, he covered the old 1973 VIN numbers with new 1978 numbers. On cross-examination, however, Ostermeier admitted the "pink slip" he received when purchasing the 1973 frame recorded the proper VIN number.

Appellant was not prosecuted in this instance but the Douglases were required to reregister their car as a 1973. Based on expert testimony concerning the relative values of used, new and composite 1978 and 1973 cars, the composite car Ostermeier sold the Douglases was worth less than half its purchase price of $24,354.

Appellant testified the Douglases knew the car was a composite because he personally told them it was. Based on contradictory evidence, the jury found appellant did not tell them the truth about the car. Both Michael and Patricia Douglas testified Ostermeier never told them the car was a composite or that it was comprised of parts from salvaged cars. The sales invoice did not mention the word "salvage." The registration forms did not bear the word "salvage."

The Douglases retained counsel to negotiate a rescission of the contract. When these negotiations failed the Douglases brought suit for rescission of the contract alleging fraudulent misrepresentation and requesting compensatory and punitive damages.

The case was tried before a jury. The jury awarded the Douglases rescission of the contract and restitution of the sales price of $24,354.25 with return of the car to appellants. The jury also awarded compensatory damages in the amount of $10,624 and punitive damages of $187,000.

Alleging the punitive damage award was excessive, appellants filed post-trial motions for judgment notwithstanding the verdict and for a new trial. Appellants' motions were denied and this appeal followed.

### DISCUSSION

Appellants' brief on appeal purports to raise several issues. The only issue for which appellants present argument and authority, however, concerns not respondents' entitlement to punitive damages but the amount of the punitive damage award. Specifically, appellants contend Patricia Douglas's testimony as an expert on the value of appellants' business property was improper and prejudicially influenced the jury to award a large amount of punitive damages. They also allege the punitive damage award is excessive as a matter of law and cannot stand in the absence of evidence of net worth. ■ The other issues need not be considered. (*Jimmy Swaggart Ministries* v. *State Bd. of Equalization* (1988) 204 Cal.App.3d 1269, 1294 [250 Cal.Rptr. 891] [" 'Where a point is merely asserted by appellant's counsel without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court. [Citation.]' "].)

We note this appeal presents no challenge to the jury's finding of liability or to the propriety and amount of the compensatory damages award. We therefore focus our attention on the award of punitive damages.

## I. It Was Not Reversible Error to Allow Expert Testimony From Respondent Patricia Douglas on the Value of Appellants' Business Property.

■ Appellants assert the trial court committed reversible error in accepting Patricia Douglas as an expert on property valuation and in allowing her to offer her opinion the land value of appellants' business property was between $5 and $6 million. Appellants contend this testimony was improper because the valuation was mere speculation from one with no demonstrated expertise in evaluating commercial properties.

On voir dire Patricia Douglas testified she had been a real estate agent for 10 years and a broker for the past 2 years. She testified that to acquire her broker's license, she was required to complete additional educational courses and secure a special designation from the National Association of Realtors. She testified she primarily sold residential real estate but handled two to three commercial properties a year.

Appellants objected to Patricia Douglas's testimony as lacking foundation, contending she was not qualified as an expert. The trial court then conducted its own voir dire of Patricia Douglas's qualifications and the following exchange took place:

"THE COURT: Did you communicate that you had testified in court with regard to values of real property?

"THE WITNESS: That's correct.

"THE COURT: On how many occasions?

"THE WITNESS: I think I've had to actually testify personally once, but I've submitted the paperwork and—which was sufficient in court, I think about three times.

"THE COURT: You qualified to testify on the one occasion that you did?

"THE WITNESS: Yes, uh-huh.

"THE COURT: The objection will be overruled. You may proceed."

Patricia Douglas testified appellants' business property was approximately 80 feet wide by 500 feet long. Ostermeier's businesses, consisting of a 4,000-square-foot restaurant, manufacturing facilities for gull-wing model vehicles, used car sales, auto body shop and auto painting shop, used only a

portion of the property. The balance of the property was leased out to other business tenants.

On cross-examination by appellants' counsel, Patricia Douglas admitted she had not conducted a comparative market analysis of the property. She also admitted, except for the three times she visited appellants' property for the purpose of purchasing the car, she had not visited the property since and had never scrutinized the property for purposes of valuation. Appellants' counsel also attacked her valuation assessment of $5 to $6 million as excessive which was later conceded by respondents' counsel in closing argument. After vigorous cross-examination, Patricia Douglas admitted she did not know how the property was zoned, was not familiar with the exact property values of nearby high-rise hotels and office buildings and, ultimately, that she had limited familiarity with commercial properties.

Appellants acknowledge the question of whether a witness is qualified to testify as an expert is within the sound discretion of the trial court. Appellants assert the appropriate standard for review of a trial court's decision concerning the admissibility of expert testimony on land values is found in *Sooy v. Kunde* (1947) 80 Cal.App.2d 347 [181 P.2d 758]. In addressing an argument the testimony of a neighboring farmer was improperly excluded on the question of the property's value, the court stated: "The determination of the qualifications of a witness to testify concerning the value of land is addressed to the trial judge and is largely subject to his sound discretion. In the absence of clear abuse of that discretion the determination of the trial judge that such a witness is or is not qualified to testify as to the value of the land in question will not be disturbed on appeal. The value of the land is essentially a question of opinion to be established by expert testimony. It is not sufficient that a farmer may have general knowledge of real estate values. He must be familiar with the market price of similar land in the same neighborhood and he should be acquainted with the property involved in the action. He should possess special knowledge regarding the particular land in question which should enable him to form an intelligent and fairly accurate estimate of the actual market value of the land." (*Id.* at p. 355.)

Under this standard we cannot say it was an abuse of discretion to allow Patricia Douglas to testify as an expert on land values. She testified she became familiar with appellants' property from her three different visits. Her expertise in valuing land in general was demonstrated by her experience as a real estate agent/broker for about 12 years. The trial court was also influenced by testimony she had qualified as an expert on a prior occasion on the subject of land values. Under such circumstances, we cannot say it was a manifest abuse of discretion to allow Patricia Douglas to testify as an expert on land values.

Nor do we find her opinion based on improper matter such that the trial court should have stricken her testimony sua sponte. (See Evid. Code, § 803; cf. *Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650 [136 Cal.Rptr. 203] [testimony of *architect* as to customs and practices concerning safety practices in *construction* industry properly excluded].) That her opinion of the value of appellants' property was not substantiated by solid documentary evidence is a challenge not to the admissibility of Patricia Douglas's testimony but rather to the weight to be given her opinion. (See, e.g., *Helvy* v. *Webb* (S.D.Cal. 1941) 36 F.Supp. 243 [testimony of plaintiff placing a value of $200 per acre on grazing land was not entitled to any weight where plaintiff did not show any familiarity with the land acquired either by residence in the vicinity or dealing in similar lands].)

In this case the jury was instructed according to BAJI No. 2.40 which advised the jury: "In determining what weight to give each opinion, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion.

"An opinion is only as good as the facts and reasons on which it is based. If you find that any such fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based."

We assume the jury followed this instruction and gave Patricia Douglas's testimony the weight it deserved.

 Appellants nevertheless contend the testimony was prejudicial as a matter of law because it was the testimony of a party who was presumptively biased. ██ ██ Testimony of a biased witness is only prejudicial if the fact of bias is not presented to the jury for evaluation and the testimony affected the outcome of the case. (See, e.g., *Davis* v. *Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105] [rules of evidence prevented jury from learning key witness was testifying in exchange for leniency on pending juvenile delinquency charges].) Once the jury becomes aware of a witness's potential bias, the fact of bias merely becomes a factor in their assessment of that witness's credibility. The fact this witness—one of the plaintiffs in the lawsuit—had an interest in the outcome of the suit was no doubt not lost on the jury. Of course, the same argument could be made about Ostermeier's testimony the property had a market value of approximately $1 million offset by a $850,000 mortgage.

 Even if Patricia Douglas's testimony should have been stricken, improper admission of evidence is not reversible error absent a demonstration of actual prejudice amounting to a miscarriage of justice. (Cal. Const.,

art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."].) Moreover, prejudice from improper evidence will not be presumed but must be affirmatively demonstrated. (See, e.g., 9 Witkin Cal. Procedure (3d ed. 1985) Appeal, § 325, p. 335 ["The burden is on the appellant, not alone to show error, but to show injury from the error."].) ▉▉ Here, appellants have not shown they were actually injured by this testimony. Despite Patricia Douglas's testimony appellants' business property alone was worth between $5 and $6 million, the jury awarded $187,000 in punitive damages. It would appear the jury did not rely exclusively on Patricia Douglas's estimation of the value of appellants' property.

In sum, appellants have failed to demonstrate any prejudice from the expert testimony on the value of this land.

## II. THE AWARD OF PUNITIVE DAMAGES IS APPROPRIATE IN THIS CASE.

During the pendency of this appeal the California Supreme Court rendered its opinion in *Adams* v. *Murakami, supra,* 54 Cal.3d 105, holding that as a prerequisite to an award of punitive damages, a plaintiff must present evidence of a defendant's financial condition. We requested briefing from the parties on the issues of whether this decision should be applied retroactively to this case; and, if so, whether sufficient evidence of the defendants' financial condition was presented at trial to satisfy the requirements of *Adams* v. *Murakami, supra.*

▉▉ The general rule is that an overruling decision of a court of supreme jurisdiction is retrospective in its application. (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059]; *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 151 [181 Cal.Rptr. 784, 642 P.2d 1305]; *United States* v. *Security Industrial Bank* (1982) 459 U.S. 70, 79 [74 L.Ed.2d 235, 243, 103 S.Ct. 407].) There are exceptions, however, and this new rule announced by the Supreme Court presents an extraordinarily close case on the issue of retroactivity.

Exceptions to the general rule of retroactivity are recognized when considerations of fairness, foreseeability and public policy preclude full retroactivity. ▉▉ "For example, where a constitutional provision or statute has received a given construction by a court of last resort, and contracts have been made or property rights acquired in accordance with the prior decision,

neither will the contracts be invalidated nor will vested rights be impaired by applying the new rule retroactively. [Citation.]" (*Peterson* v. *Superior Court*, *supra*, 31 Cal.3d at p. 152.) Relying on this rationale, the California Supreme court in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], held its newly announced rule overruling *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], which recognized a private cause of action by an injured plaintiff against a liability insurer for violation of Insurance Code section 790.03, should only have prospective application. The court concluded considerations of fairness and public policy dictated parties who had already embarked on litigation should receive the benefit of the highest court's express prior ruling on which they had relied.

In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr.858, 532 P.2d 1226, 78 A.L.R.3d 393], the Supreme Court gave limited retroactive effect to the newly announced rule adopting "pure" comparative negligence in view of the substantial number of cases involving that issue then pending in trial and appellate courts, and particularly considering the "reliance applicable to individual cases according to the stage of litigation which they have reached . . . ." (*Id.* at p. 829.) Thus, the public policy and fairness concerns dictating limited retrospective effect in that case were litigants' reliance on the former rule and the impact full retroactivity would have on the administration of justice in that virtually every suit involving negligence would require a new trial.

Considerations of fairness guided the Supreme Court's decision in *Aced* v. *Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573 [12 Cal.Rptr. 257, 360 P.2d 897], in which the trial court and counsel relied on consistent Court of Appeal decisions upholding the sufficiency of a particular form of order granting a new trial for insufficiency of the evidence. In overruling these decisions, the court stated: "It follows from what we have said that the order of the trial court did not amount to a specification of insufficiency of the evidence as a ground for granting a new trial. However, in view of the fact that before we could reach this conclusion it was necessary to disapprove of cases upon which both the trial court and counsel may have relied with respect to the form of the order, we feel that we should not refuse to consider the ground of insufficiency of the evidence as a basis for the order. While it is true that ordinarily an overruling decision is deemed to state what the law was from the beginning and is therefore generally given retroactive effect, an exception has been applied in several instances with respect to procedural matters. [Citations.] Under the circumstances of the present case it would be unfair to apply section 657 so as to deprive Aced of the possibility of having the order for a new trial sustained upon the ground of insufficiency of the

evidence." (*Id.* at pp. 579-580; see also *Chevron Oil Co.* v. *Huson* (1971) 404 U.S. 97, 108 [30 L.Ed.2d 296, 306, 92 S.Ct. 349] [declining to apply holding overruling series of consistent decisions of the Circuit Court of Appeals that state's one-year statute of limitations applied to plaintiff's cause of action because it would "deprive the respondent of any remedy whatsoever on the basis of superseding legal doctrine that was quite unforeseeable."].)

After a comprehensive analysis of various decisions determining whether an overruling decision should be given prospective or retrospective effect, the California Supreme Court in *Peterson* v. *Superior Court, supra,* 31 Cal.3d 147, summarized the factors that comprehend the considerations of public policy and fairness. "Public policy considerations include the purpose to be served by the new rule, and the effect on the administration of justice of retroactive application. Considerations of fairness would measure the reliance on the old standards by the parties or others similarly affected, as well as 'the ability of litigants to foresee the coming change in the law. . . .' [Citations.]" (*Id.* at p. 153.)

Most recently, in *Newman* v. *Emerson Radio Corp., supra,* 48 Cal.3d 973, the Supreme Court examined the retroactivity issue left open in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], which held a *Tameny* (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330]) tort cause of action would not lie against an employer for breach of the implied covenant of good faith and fair dealing in an employment contract.

In that decision the court rejected the plaintiff's suggestion *Foley* should not be applied retroactively because the new rule of law was unforeseeable. The two dispositive factors in their decision appear to be based on the inconsistency in Court of Appeal decisions and the fact the new rule of law did not overrule a prior decision of the state's highest court. "Although our *Foley* decision overruled a consistent line of Court of Appeal cases holding that some actions based on the implied covenant of good faith and fair dealing in the employment context could give rise to tort damages [citations] the *Cleary* doctrine stood for less than six years before we granted review to consider the issue. We are not persuaded that this is the kind of 'longstanding' lower court rule that justifies nonretroactivity in the absence of compelling additional reasons.

"Because the relevant portion of *Foley* did not address an area in which this court had previously issued a definitive decision, from the outset any reliance on the previous state of the law could not and should not have been viewed as firmly fixed as would have been the case had we previously

spoken. (Compare *Moradi-Shalal, supra,* 46 Cal.3d 287.) Even if one views *Foley* as breaking new and unexpected ground, a point we do not concede, it did so in an indisputably unsettled area. As we explained in *Foley,* the Court of Appeal decisions following *Cleary* [v. *American Airlines, Inc.* (1980)] 111 Cal.App.3d 443 [168 Cal.Rptr. 722], either uncritically adopted the *Cleary* rule or themselves undertook incomplete analyses. (See *Foley, supra,* 47 Cal.3d at p. 688.) The cases were not in agreement as to the appropriate standards permitting recovery of tort damages, leading to uncertainty which was reflected in the variety of Court of Appeal analyses as well as in confusing pleadings in the trial courts. . . . Although there was general agreement among the various Courts of Appeal that *some* form of tort action was available to employees based on the covenant of good faith and fair dealing, there was *anything but* 'near-unanimity' as to the elements of that cause of action or the standards to be applied in determining its actionability. . . ." (48 Cal.3d at pp. 986-987, italics in original.)

The court also relied on the absence of other factors that would support application of the rule prospectively. Retroactive application of the *Foley* rule would not divest plaintiffs of a property or contract right. Nor did the decision leave plaintiffs without any remedy whatsoever. (48 Cal.3d at p. 991; compare *Chevron Oil Co.* v. *Huson, supra,* 404 U.S. 97.) Finally, the court determined retroactive application of *Foley* would not unduly burden the administration of justice. For cases not yet brought to trial, any reference to a tort cause of action could be stricken from the complaint. For cases already tried, the court rejected the argument retrial in every instance would be required. The court found it very likely a substantial number of cases would have used special verdict forms separating tort damages from contract damages. In these cases, the tort damages could be excised from the judgment. (48 Cal.3d at p. 992.)

There are several parallels between *Newman* and the case at bar which point to retroactive application of the high court's decision in *Adams* v. *Murakami, supra.*

First, considerations of fairness—reliance on the old standards and foreseeability of a change in the law—on balance weigh in favor of retroactive application. Retroactive application of the rule will not deprive a plaintiff of a property or contract right. Nor will a plaintiff be denied any remedy whatsoever. A plaintiff is still entitled to punitive damages, although proof of entitlement will be much more burdensome. The *Adams* decision did not overrule a prior decision of the state's highest court. The California Supreme Court had never before spoken on the issue. (Compare *Moradi-Shalal, supra,* 46 Cal.3d 287.) Nor did the *Adams* decision overrule a series of unanimous

and consistent Court of Appeal decisions on the issue. (Compare *Parrott* v. *Furesz* (1957) 153 Cal.App.2d 26, 30 [314 P.2d 47] ["The appellant's counsel in 1955, when this case was tried, had every reason to believe that BAJI Number 205 not only correctly stated the law but that it had the approval of the Supreme Court and of the District Courts of Appeal. Appellant is entitled to a trial on the issue of last clear chance. He has not had one. It would be manifestly unfair and a mockery of justice to deprive him of one because his counsel lacked the gift of prophecy and could not foresee that in 1957 the Supreme Court in *Brandelius* would have pointed out to it an error in the instruction which had theretofore escaped the combined observation of several appellate courts and numerous able attorneys."].)

Unlike *Foley*, the present situation is not one of inconsistency in formulating standards for or in applying an accepted rule of law. Here, there was disagreement among the Courts of Appeal, albeit minor, as to a requirement of evidence of a defendant's financial condition as a prerequisite to an award of punitive damages. The majority rule in California, and the uniform rule in the Second, and largest, Appellate District, was a plaintiff could, but was not required to, present evidence of a defendant's financial condition. However, in 1989 one division of the Fourth Appellate District concluded meaningful appellate review of an award of punitive damages was impossible in the absence of evidence of a defendant's financial condition. (*Dumas* v. *Stocker* (1989) 213 Cal.App.3d 1262 [262 Cal.Rptr. 311].) The decision, while criticized by many courts, generated considerable attention, and ultimately the Supreme Court granted review in *Adams* v. *Murakami* to resolve the issue.[1] Thus, because of the lack of unanimity in Court of Appeal decisions on such an important and controversial matter, it was foreseeable the state's

---

[1]The general rule a plaintiff was not required to present evidence of a defendant's worth to sustain an award of punitive damages was first expressly recognized in *Hanley* v. *Lund* (1963) 218 Cal.App.2d 633, 645-646 [32 Cal.Rptr. 733], a Court of Appeal decision from the Second Appellate District. This rule has been followed exclusively in the Second Appellate District and has been the controlling rule in other districts as well. (*Greenfield* v. *Spectrum Investment Corp.* (1985) 174 Cal.App.3d 111 [219 Cal.Rptr. 805] [Second Dist.]; *Vossler* v. *Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952 [192 Cal.Rptr. 219] [Fifth Dist.]; *Nelson* v. *Gaunt* (1981) 125 Cal.App.3d 623, 643 [178 Cal.Rptr. 167] [First Dist.]; *Zimmer* v. *Dykstra* (1974) 39 Cal.App.3d 422, 439 [114 Cal.Rptr. 380] [Second Dist.]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] [Fourth Dist.]; *Fenlon* v. *Brock* (1989) 216 Cal.App.3d 1174 [265 Cal.Rptr. 324] [Fourth Dist.]; *Pat Rose Associates* v. *Coombe* (1990) 225 Cal.App.3d 9 [275 Cal.Rptr. 1] [Fourth Dist.]; *Liberty Transport, Inc.* v. *Harry W. Gorst Co.* (1991) 229 Cal.App.3d 417 [280 Cal.Rptr. 159] [Second Dist.].)

On September 11, 1989, a panel of the Fourth Appellate District decided *Dumas* v. *Stocker*, *supra*, 213 Cal.App.3d 1262, which held an award of punitive damages could not stand in the absence of evidence of a defendant's net worth. This decision broke with long-standing practice and was considered an aberration in California jurisprudence. (See, e.g., *Liberty Transport, Inc.* v. *Harry W. Gorst Co.*, *supra*, 229 Cal.App.3d 417, 438; *Fenlon* v. *Brock*,

highest court would at some point need to address the issue directly. What was not particularly foreseeable, however, was that the Supreme Court would adopt the conclusion and rationale of the minority position among the Courts of Appeal that had considered the question.

While the rule remained consistent within the Second Appellate District, litigants' reliance on the previous rule—evidence of a defendant's financial condition was not required to sustain an award of punitive damages— became a somewhat more risky proposition once contrary authority appeared. For example, the Use Note to BAJI No. 14.71 (1989 rev.) on entitlement to punitive damages cautions the court and counsel of the "two lines of appellate authority on this subject." (BAJI No. 14.71 (7th ed. 1991 pocket pt.) p. 63 citing *Dumas* v. *Stocker, supra,* 213 Cal.App.3d 1262, which reversed an award for lack of evidence of a defendant's net worth, and *Vossler* v. *Richards Manufacturing Co., supra,* 143 Cal.App.3d 952 and *Fenlon* v. *Brock, supra,* 216 Cal.App.3d 1174, two decisions which reaffirmed the longstanding rule the plaintiff may, but is not required to, present evidence of a defendant's worth.)

Thus, since at least 1989 there has been some question whether absolute reliance on the old rule was warranted. And as noted, while the new rule was not particularly foreseeable, it was expected the Supreme Court would in time definitively resolve the question of whether evidence of a defendant's financial condition was a prerequisite for an award of punitive damages. We conclude, on balance, considerations of fairness in terms of parties' reliance on the old rule and the foreseeability of the new rule do not compel the conclusion an exception to the general rule of retroactivity is warranted in this case.

Public policy considerations include the purpose to be served by the new rule and the effect of the new rule on the administration of justice. ▪ The purposes enunciated in *Adams* v. *Murakami* for evidence of a defendant's wealth as a prerequisite for punitive damages are twofold. First, evidence of financial condition in the record will assist an appellate court in determining whether the amount of an award of punitive damages is appropriate in a given case. Second, evidence of a defendant's wealth will assist the jury in determining what amount of damages, in light of the defendant's wealth, it will require to punish past misconduct and deter this defendant's misconduct in the future.

*supra,* 216 Cal.App.3d 1174, 1180 [another Fourth Dist. panel refused to follow the *Dumas* analysis as erroneously decided].) At the time of the Supreme Court's decision in *Adams* v. *Murakami,* only one other court had adopted the analysis of *Dumas.* (*Storage Services* v. *Oosterbaan* (1989) 214 Cal.App.3d 498 [262 Cal.Rptr. 689] [First Dist.].)

If evidence of financial condition was presented at trial, the purposes of the new rule have been served even without retroactive application of the *Adams* decision. But where there was insufficient evidence presented at trial to support the award of punitive damages, retroactive application of the *Adams* decision would further the purpose of meaningful appellate review and assure the punishment meted out to the defendant is neither inadequate nor excessive to fulfill the dual purposes of punishment and deterrence.

We first consider the potential effects on the administration of justice from retroactive application of the decision in *Adams* v. *Murakami.*

It is very likely plaintiffs in many cases not yet final presented sufficient evidence of the defendant's financial condition to satisfy the new requirements of *Adams* v. *Murakami.* These cases, of course, would be unaffected by this decision, as would cases not yet brought to trial. There also might be cases in which the defendant presented evidence of his or her financial condition. Although the burden is now on the plaintiff to present such evidence, there is no principled reason to require retrial of those cases. Nor do we believe it would be necessary, except perhaps in the most extraordinary case, to require retrial of liability for compensatory damages or entitlement to punitive damages where insufficient evidence of a defendant's financial condition was presented at trial to support the amount of the award.

In this case, the jury used a special verdict form which first inquired as to appellant's liability for and the amount of compensatory damages to be awarded on each cause of action. The jury was separately asked whether appellant was liable for punitive damages and, if so, in what amount. Because the amount of punitive damages awarded was segregated from the question of entitlement to punitive damages, the amount of the award may be excised and retried without disturbing the jury's other findings. This will be true of the vast majority of cases involving punitive damages which are not yet final.

Many cases may have taken advantage of the new procedures in Civil Code section 3295 allowing for bifurcation. Under this procedure, the jury first decides whether to impose liability for compensatory damages and whether the defendant acted with fraud, malice or oppression. (Civ. Code, § 3295, subd. (d); see also BAJI No. 14.72.1 (1989 re-rev.) (7th ed. 1991 pocket pt.) p. 64.) The jury is then separately asked whether to impose punitive damages and, if so, in what amount. Because an award of punitive

damages is separated from findings on general liability and the amount of compensatory damages, it should be unnecessary to retry any issue other than the amount of punitive damages in cases affected by the decision in *Adams*.

Nevertheless, retrial of even the limited issue of the appropriate amount of punitive damages in light of the defendant's financial condition will place a heavy burden on the administration of justice. First, before retrial of the amount of punitive damages, it will be necessary to conduct extensive discovery of the defendant's finances, assets and holdings. (Civ. Code, § 3295, subd. (c).) Courts will necessarily be involved in issuing subpoenas, ruling on discovery motions and enforcing orders.

Secondly, in most, if not all, of the cases requiring retrial the parties will request a jury trial. Jury trials are, of course, time consuming, expensive and taxing on a superior court system which already is overburdened with pending civil and criminal matters.

Thirdly, in order to demonstrate the reprehensibility of the defendant's conduct, witnesses will need to testify and evidence will need to be presented, presumably as extensively as would be required to prove entitlement to punitive damages in the first instance. It would be the rare plaintiff who would consent to a stipulation the defendant acted fraudulently, with malice or oppression and forego the opportunity to have the jury hear the precise factual details of the defendant's reprehensible conduct. The practical effect of a plaintiff wanting to reestablish entitlement to punitive damages will be lengthy retrials, possibly consuming as many court days as it took to try the matter originally. Retrials will require duplication of efforts by counsel, higher costs to litigants and an increased demand on court personnel and resources. Thus, retroactive application of the *Adams* decision will have a definite negative impact on judicial resources in terms of adding to an already overburdened justice system which is currently suffering from an excessive work load and severe budgetary restraints.

On the other hand, while it is impossible to be certain precisely how many cases currently pending in the court system will require retrial, it appears the actual numbers may be fewer than media accounts of the incidence of punitive damages might suggest. A somewhat dated study prepared by the Rand Corporation indicates retroactive application of the requirement of evidence of a defendant's financial condition might only affect 200 or 300

cases and possibly fewer.[2] Under these circumstances, the effect of retroactive application of the *Adams* v. *Murakami* decision on the administration of justice, while not negligible, is not of the magnitude that concerned the court in *Li* v. *Yellow Cab Co., supra,* 13 Cal.3d 804, where the newly announced rule would have required complete retrial of virtually every case alleging a negligence cause of action or defense.

On balance and by a narrow margin, fairness and public policy concerns, as defined and explained in decisions of our highest court indicate retroactive application of its decision in *Adams* v. *Murakami* is appropriate. Accordingly, we apply that decision to the instant case.

In *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980], the Supreme Court cited three factors the jury must consider in awarding punitive damages: the nature of the defendant's wrongdoing, the amount of compensatory damages and the wealth of the particular defendant. Because one of the purposes of a punitive damage award is to deter future misconduct, "It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) On the other hand, the award should not be so excessive it "exceeds the level necessary to properly punish and deter." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.)

Our finding the decision in *Adams* v. *Murakami* should be given full retroactive effect, however, does not require retrial of the punitive

---

[2]According to a study conducted by the Rand Corporation's Institute for Civil Justice of tort cases in California, punitive damages were awarded in approximately one of every ten trials in which plaintiffs won compensatory damages during the period 1980 to 1984. (Peterson et al., Punitive Damages Empirical Findings, RAND Corp., R-3311-ICJ (1987) p. 33.) The study broke down the frequency of awards by jurisdiction as follows:

| | PUNITIVE DAMAGE AWARDS 1981-1984 | PUNITIVE DAMAGE AWARDS PERCENTAGE OF TRIALS IN WHICH COMPENSATORY DAMAGES AWARDED |
| --- | --- | --- |
| Los Angeles County | 149 | 10.1% |
| San Francisco County | 51 | 13.6% |
| Major urban counties | 120 | 11.0% |
| Other urban counties | 86 | 6.8% |
| Rural counties | 12 | 5.2% |
| TOTAL CALIFORNIA | 418 | 9.4% |

Many of the cases awarding punitive damages during this period were actions involving bad faith in the business or contract context. Presumably, the *Foley* and *Moradi-Shalal* decisions have since had some effect on the incidence of punitive damage awards in insurance and employment cases.

damage award in this case. In the case at bar, sufficient evidence was presented at trial to support the jury's award of $187,000 in punitive damages.

There was testimony from both sides Ostermeier operated several wholly owned businesses. There was also testimony from both sides appellants' main business property was located in a prime area near all major freeways and the San Pedro Harbor. According to Patricia Douglas's expert testimony on the market value of this business property, the land alone was worth between $5 and $6 million.

Ostermeier testified his business property was worth approximately $1 million but was encumbered with a $850,000 mortgage. He also testified his car restoration business was worth $100,000 and his home equity was $80,000. According to Ostermeier his 4,000-square-foot restaurant had no value and he lost money building gull wing vehicles despite an average sales price of $60,000 per vehicle. While there was evidence of other business tenants who occupied his business property, there was no evidence of precisely how much income Ostermeier derived from these tenants.

Thus, evidence of appellants' financial condition was presented at trial for the jury's, and this court's, evaluation.

If the jury believed only Ostermeier's testimony and rejected Patricia Douglas's testimony in its entirety, the punitive damage award of $187,000 would be nearly half the admitted value of Ostermeier's *business* property. However, if the jury believed Patricia Douglas that the value of the land occupied by Ostermeier's business property alone was worth between $5 and $6 million, the punitive damage award of $187,000 was a small fraction of appellants' worth and cannot be viewed as excessive. This is especially true in light of appellants' egregious conduct. Even if the jury believed Ostermeier's testimony the property was encumbered with a $850,000 mortgage, the net value of the land would still be over $4 million. If the jury believed this version of the facts, the award could still not be viewed as excessive.

 It is an important principle of appellate law that "All issues of credibility are [] within the province of the trier of fact. . . ." (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) " ' "In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is

any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." ' " (*Estate of Teel* (1944) 25 Cal.2d 520, 526 [154 P.2d 384], italics omitted.) Here the jury clearly resolved the issue of credibility of the testimony against appellants.

 Nor after a review of the entire record can we say the punitive damage award was a result of passion and prejudice. It is not so grossly disproportionate to the award of compensatory damages as to raise the presumption it was the result of passion and prejudice. As noted in innumerable decisions, the specific ratio of compensatory damages to punitive damages is not a reliable indicator of a proper award of punitive damages. (See, e.g., *Devlin* v. *Kearney Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381 [202 Cal.Rptr. 204]; *Finney* v. *Lockhart* (1950) 35 Cal.2d 161 [217 P.2d 19] [punitive damage award with ratio of 2,000 to 1 affirmed].) What is important is that the award bear a reasonable relationship to the award of compensatory damages or the injury sustained. (*Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d 910.)

 ██ █ In this case respondents were awarded rescission of the contract for over $24,000 and were also awarded over $10,000 on the fraud cause of action.[3] While respondents had to return the automobile as part of this rescission, that vehicle was worth considerably less than the $24,000 they paid for it. Thus some substantial portion of the money they received back through rescission represented a net monetary award to them. ██ █ Under the standards established in prior California cases, the punitive damages award of $187,000 is well within a reasonable range (see, e.g., *Devlin* v. *Kearney Mesa AMC/Jeep/Renault, Inc., supra*, 155 Cal.App.3d 381, appendix).[4]

[3]Technically, rescission and restitution of a contract are equitable remedies and generally are not considered part of an award of compensatory damages. Equitable remedies are, however, properly considered in assessing entitlement to and the proper amount of punitive damages.

In *Horn* v. *Guaranty Chevrolet Motors* (1969) 270 Cal.App.2d 477, 484 [75 Cal.Rptr. 871], auto purchasers unilaterally rescinded and recovered the payments they made to the seller plus punitive damages. In upholding the award of punitive damages the Court of Appeal stated: "it is immaterial that plaintiffs' recovery is in the form of specific restitution, rather than monetary damages. . . ." (See also *Esparza* v. *Specht* (1976) 55 Cal.App.3d 1 [127 Cal.Rptr. 493] [award of punitive damages upheld although plaintiff suffered no actual damage after the offset on the cross-complaint]; *Weiss* v. *Blumencranc* (1976) 61 Cal.App.3d 536 [131 Cal.Rptr. 298] [$20,000 in punitive damages allowed in equitable action for reformation and cancellation of shares of stock]; *Cobian* v. *Ordonez* (1980) 103 Cal.App.3d Supp. 22 [163 Cal.Rptr. 126] [$2,000 award of punitive damages upheld in action for rescission and restitution of car sales contract].)

[4]Even if we considered only the compensatory damage award of $10,624, the ratio to punitive damages would be 17 to 1. However, since some substantial portion of the $24,000

Also a critical factor for consideration is the egregiousness of the defendant's conduct. Here, the nature of appellants' acts, quite possibly criminal in nature, were at a minimum fraudulent and despicable. Ostermeier's acts demonstrated he was a menace to society and presented a public nuisance. This is a particularly fitting case for an award of punitive damages to punish misconduct and to deter similar acts in the future.

Thus, under all the circumstances of this case—evidence of appellants' financial condition, the egregiousness of the conduct, and the amount of compensatory damages and equitable relief awarded—the award of punitive damages was not excessive and was supported by the evidence.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs on appeal.

Lillie, P. J., concurred. Woods (Fred), J., concurred in the judgment.

Appellants' petition for review by the Supreme Court was denied February 27, 1992.

---

respondents received through rescission also represented a net monetary award to respondents, the actual ratio is substantially less than 17 to 1. In any event, there is no fixed ratio by which to determine the reasonableness of the relationship between punitive damages and the actual harm suffered. (*Finney* v. *Lockhart, supra,* 35 Cal.2d at p. 164.) Ratios as high as 2,000 to 1, 200 to 1 and 80 to 1 have been approved by California courts. (See *Devlin* v. *Kearney Mesa AMC/Jeep Renault, Inc., supra,* 155 Cal.App.3d 381, appen. pp. 393-396.) The calculation of punitive damages does not involve strict adherence to a rigid formula but instead involves "a fluid process of adding or subtracting depending upon the nature of the acts and the effect on the parties and the worth of the defendants." (*Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 998 [149 Cal.Rptr. 119].) "In the final analysis, therefore, the propriety and amount of punitive damages depends entirely upon the particular facts of a case. Thus, to meaningfully apply the 'reasonable relation' rule, the trier of fact (and reviewing court) should not focus on some bottom-line amount of an award of compensatory damages but on the nature and degree of the actual harm suffered by the plaintiff (and perhaps others.)" (*Gagon* v. *Continental Casualty Co.* (1989) 211 Cal.App.3d 1598, 1604 [260 Cal.Rptr. 305].)