[No. B042996. Second Dist., Div. Seven. Dec. 10, 1991.]

SHEILA NEALY WASHINGTON et al., Plaintiffs and Respondents, v. NORA F. FARLICE, Defendant and Appellant.

**COUNSEL**

Udovic & Chavez and E. Thomas Chavez for Defendant and Appellant.

Baker & McKenzie, Gordon E. Bosserman and Glenn L. Savard for Plaintiffs and Respondents.

**OPINION**

**JOHNSON, J.**—Appellant, Nora F. Farlice, appeals from a judgment entered on a jury verdict claiming the award of compensatory damages of $10,000 for the false imprisonment of respondent Lynell Washington was unsupported by the evidence. Appellant also contends the $50,000 award of punitive damages is excessive as a matter of law. We conclude the compensatory damage award is supported by substantial evidence and affirm that award. However, we further conclude insufficient evidence was produced at trial to support the punitive damage award of $50,000. We consequently reverse that portion of the judgment and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEEDINGS BELOW

Appellant was the girlfriend of respondents' father, Theodore R. Nealy, a.k.a. Hough Dankines, from 1976 until his death in 1982. Appellant was a real estate agent. Dankines headed a non-profit religious organization. During this relationship appellant quitclaimed a half interest to Dankines in a three-unit residential building located at 2143 Windsor Avenue, Altadena. Nine months after Dankines death, appellant recorded a deed to this property in which Dankines purportedly quit-claimed back to appellant his half interest in the property. Dankines and appellant also jointly purchased a single family residence during this period in Val Verde.

In 1978, Dankines wanted to purchase a new Camaro automobile for his daughter, respondent Sheila Nealy Washington, as her graduation present from high school. Neither Dankines nor his daughter had sufficient credit to finance the car so appellant agreed to sign the necessary documents to allow Dankines to make this gift to his daughter. Dankines made the down payment but appellant was the registered owner. In 1981 Sheila Washington's name was added to the registration with the knowledge and consent of appellant.

From 1978 to November 1983 Sheila Washington and her husband, Lynell Washington, had sole possession and use of the car. The Washingtons made no payments on the car but they did pay for maintenance and repairs as well as registration fees.

A few months after Dankines died, appellant paid off the balance of the auto loan and forged a power of attorney purporting to give authority and consent to the lending institution to transfer to herself Sheila Washington's interest in the Camaro. Appellant wanted Sheila to make monthly payments to her for use of the car but the two women never managed to arrange a meeting to discuss the matter of the Camaro. A few months later, appellant saw the Camaro parked near Dankines' prior residence where another of his daughters now resided. Appellant used her key to the car but discovered it no longer worked in the ignition. After an unrelated break-in, Sheila and Lynell Washington had had the ignition changed.

Appellant consulted with an attorney about the possibility of filing a civil lawsuit to seek return of the Camaro. She was advised against litigation because of the relatively small value of the car. Appellant chose to take the matter into her own hands and falsely reported the Camaro stolen. Appellant also falsely informed the police no one else but she and her son had the keys or permission to drive the car.

On Thanksgiving day 1983, the families gathered at Lynell Washington's mother's house for dinner. When family friends arrived at the airport from Europe, Lynell Washington volunteered to meet them at the airport. At approximately 9 p.m., Lynell Washington left in the Camaro but was pulled over by the police. Using a bull horn, the police commanded he pull the car to the side of the road. Lynell Washington complied and reached into the glove compartment for the car registration. As he did so he heard a loud cocking sound of a round of ammunition entering the chamber of a shotgun. He then noticed both officers had their weapons pointed directly at his head. He was ordered to drop the keys out of the window or he would be shot in the head. He was also told to exit the vehicle, left foot first.

Lynell Washington testified he was extremely afraid and confused. He did not know what he had done or why he was stopped. Lynell Washington had difficulty retrieving the keys from the ignition and throwing them to the ground because his hands felt "like baseball mitts." Once outside the Camaro he was told to freeze. One of the officers jabbed a gun barrel into his back and he was forced into a prone position on the ground. As he lay face down in a puddle of water on the street due to the recent rains, one of the officers kneeled on Lynell Washington's back and handcuffed him.

Lynell could not believe what was happening to him. He testified it felt as though he was lying on the wet pavement for what seemed like an eternity. He was terrified there would be an accident and he would be shot and killed.

As soon as the officers verified the stolen car report they "assisted" Lynell Washington off the pavement and into the patrol car by grabbing him by the back of the shirt. Once on his feet, Lynell Washington pleaded with the police officers for an explanation of why he was detained. When the officers accused him of stealing the car he explained the car belonged to his wife, which car registration documents in the glove compartment would confirm. Lynell Washington also described the contents of the trunk: a tennis racket, clothes and Sheila's stamp collection. Although the officers confirmed these articles were present as described, they took Lynell Washington to the Foothill Division police station in the back of the patrol car.

At the police station Lynell Washington finally managed to convince the officers he had not stolen the car. Although he was not formally booked, he was kept in a holding cell at the police station until the car was impounded and the car registration verified. Lynell Washington testified he was finally released at approximately 1 a.m. after his wife and mother arrived to confirm his story and take him home.

Lynell Washington testified he was frightened, fearful for his life, shook up and embarrassed by the incident. He found the experience degrading.

because the officers belittled him, which made him upset. The incident also caused problems with his family who blamed all the trouble on his wife, Sheila Washington, and her family.

Appellant sold the Camaro as soon as she was able to retrieve it from the police impound lot. The personal items left in the car were never returned to the Washingtons.

Sheila Nealy Washington individually, Lynell Washington individually, and Sheila Nealy Washington and Patricia Nealy as administrators of the Estate of Theodore R. Nealy, a.k.a. Hough Dankines, brought suit against appellant for, inter alia, cancellation of the forged quitclaim deed to the 2143 Windsor Avenue property in Altadena, cancellation of instruments, fraud, imposition of a trust and false imprisonment. The matter came to trial in March 1989.

By special verdict the jury found the quitclaim deed purporting to transfer Dankines' interest in the Windsor property to appellant to be a forgery. They found appellant liable to Sheila Washington for the value of the 1978 Camaro and they also found her liable for the false imprisonment of Lynell Washington. The jury further found Lynell Washington suffered $10,000 in damages as a result of the false imprisonment and found appellant liable for punitive damages in the amount of $50,000. The court later ruled the forged quitclaim deed null and void.

Appellant's motion for new trial was denied and she appealed. Appellant does not challenge the jury's findings of forgery, liability for the Camaro or for the false imprisonment. She instead attacks the compensatory damage award for the false imprisonment as excessive and unsupported by the evidence. She also contends the punitive damage award of $50,000 is excessive as a matter of law.

### DISCUSSION

I. *The Award of Compensatory Damages for the False Imprisonment of Lynell Washington Is Supported by thE Evidence.*

Appellant attacks the award of $10,000 in compensatory damages to Lynell Washington as excessive and unsupported by the evidence.

In reviewing the issue of sufficiency of the evidence, the appellate court is "bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and

in support of the judgment. . . . All issues of credibility are likewise within the province of the trier of fact. . . ." (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].)

" ' "In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. . . ." ' " (*Estate of Teel* (1944) 25 Cal.2d 520, 526 [154 P.2d 384], italics omitted.)

▉▉▉ In this case appellant contends no evidence of damages was presented to the jury because there was only limited evidence of actual out-of-pocket losses as a result of the incident. According to appellant, Lynell Washington did not require medical attention as a result of the false arrest. Nor did he seek treatment for any lingering psychological problems as a result of the incident. By the time of trial Lynell was not taking medication and did not claim to have recurring nightmares or continuing mental problems except anger when he spoke about the arrest. Also, Lynell Washington testified he missed two days' work and pay as a result of the incident whereas Sheila testified he went back to work the next week after the Thanksgiving weekend. Therefore, according to appellant, he may not have had any actual losses at all.

As noted above, all conflicts in the evidence are resolved in support of the judgment. Thus, from this testimony we can infer the jury found Lynell Washington lost a few days of work after the episode.

More importantly, appellant appears to overlook the emotional distress Lynell Washington suffered because of the false arrest. Emotional distress damages are properly recoverable if proximately caused by the tortious conduct of a defendant. (Civ. Code, § 3333 [proper measure of damages is "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not"]; *Gill* v. *Epstein* (1965) 62 Cal.2d 611, 617-618 [44 Cal.Rptr. 45, 401 P.2d 397] [plaintiff falsely arrested entitled to recover damages for physical and mental suffering for entire period of confinement]; *Gibson* v. *J.C. Penny Co.* (1958) 165 Cal.App.2d 640 [331 P.2d 1057] [in action for false imprisonment, headaches, embarrassment, emotional distress, humiliation and anxiety suffered

were properly considered by the jury in fixing the amount of damages]; *Schanafelt* v. *Seaboard Finance Co.* (1951) 108 Cal.App.2d 420, 423 [239 P.2d 42] ["She had previously lost a child prematurely and experienced great anxiety over possible loss of another as a result of the imprisonment. Such extreme anxiety or emotional distress is recognized in false imprisonment cases as one of the elements of the damage caused by the tortious act."].)

■ The standard for assessing the excessiveness of a compensatory damage award for emotional distress suffered as a result of false imprisonment is whether the award is so grossly disproportionate to a sum reasonably warranted by the facts it shocks the conscience and raises a presumption it was the result of passion or prejudice. (*Bains* v. *Brady* (1953) 122 Cal.App.2d Supp. 957, 961 [265 P.2d 194] [acknowledging a jury "has considerable discretion in determining the amount of damages where the illegal restraint is accompanied by circumstances causing humiliation, shame and public disgrace"]; *Gibson* v. *J.C. Penny Co., supra,* 165 Cal.App.2d 640, 646.)

In support of her contention, appellant relies on *Bettolo* v. *Safeway Stores, Inc.* (1936) 11 Cal.App.2d 430 [54 P.2d 24], in which the Court of Appeal reversed an award of $1,500 in damages for a false imprisonment. The plaintiff in that case was followed out of the grocery store and accused of taking candy without paying for it. Store employees discovered within a few minutes, however, the plaintiff had removed the candy he had previously hid in his coat pocket and left it at the vegetable counter. The plaintiff brought suit for false imprisonment and was awarded $1,500 against the defendant store.

The Court of Appeal reversed, finding plaintiff had proved no actual damages "of any character." (11 Cal.App. 2d at p. 432.) He had not lost any days from work, no one knew about the brief detainment except the few friends plaintiff told about the incident. The court found "The verdict of $1500 was purely a sympathy verdict inspired by prejudice and unsupported by any competent evidence of damage." (*Id.* at p. 433.) The court also noted the plaintiff had not sought, nor could he have recovered, exemplary damages. Under the facts of that case, the most that was warranted was nominal damages. (Civ. Code, § 3360.)

■ The case at bar, however, is legally and factually distinguishable. Here there was evidence of injury from the false imprisonment. Respondents also presented evidence to prove entitlement to punitive damages. Nor under the facts and circumstances of this case can the compensatory damage award be said to be grossly disproportionate to the evidence of emotional distress suffered by Lynell Washington as a result of the false imprisonment.

He testified he had never been so afraid in his life. He was terrified by the officers' guns pointing at his head and was afraid he could accidentally be shot. He was embarrassed and humiliated by the false accusation of stealing the Camaro and found the experience of being treated like a common criminal degrading and humiliating. Although he was not injured physically, he still feels a great deal of anger over the incident and is still afraid of being pulled over by police. The episode also adversely affected relations between him and his wife and his family who treat Sheila and her family as the cause of the problems.

In this case, the jury was properly instructed if they found Lynell Washington was entitled to a verdict against appellant for false imprisonment, they should award him damages in an amount that would reasonably compensate him for all damages suffered as a proximate result of the false imprisonment including "compensation for fears, anxiety, and other mental and emotional distress" meaning "all highly unpleasant mental reactions, such as grief, shame, humiliation, embarrassment, anger, chagrin, disappointment and worry." (BAJI No. 12.72 as modified.)

The jury found Lynell Washington suffered damages as a result of the false imprisonment in the amount of $10,000. Because the finding is supported by the evidence of actual mental suffering by Lynell Washington, and does not appear to be grossly disproportionate given the facts and circumstances of this case, it will not be disturbed on appeal.

II. *The Award of $50,000 in Punitive Damages Is Not Supported by the Evidence.*

 Appellant attacks the $50,000 punitive damage award as unsupported by any evidence of malice. She also claims the award is excessive as a matter of law because it is not based on evidence of her net worth.

Respondents, on the other hand, contend evidence of appellant's acts of fraud, malice, oppression and willful and conscious disregard for the rights of others was overwhelming. (Civ. Code, § 3294.) Respondents also contend sufficient evidence of appellant's worth was presented at trial to allow the jury to arrive at an appropriate punitive damage award. Finally, respondents point out, the rule in the Second Appellate District is a plaintiff may, but is not required to, present evidence of a defendant's wealth to support an award of punitive damages. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980].)

 Appellant's first point does not merit extensive discussion. Although at trial she made repeated protestations of regret and remorse for her

actions, evidence of her intent to vex, injure, harass and annoy respondents was overwhelming. At the very least, appellant's filing of the false stolen auto report demonstrated willful indifference to the rights and safety of others. The jury's finding of liability for punitive damages was warranted by the evidence and no contrary argument can reasonably be entertained.

■■■ Appellant's second argument merits closer attention. During the pendency of this appeal, the California Supreme Court decided *Adams* v. *Murakami* (1991) 54 Cal.3d 105 [284 Cal.Rptr. 318, 813 P.2d 1348], which announced the new rule that evidence of a defendant's financial condition must be presented at trial as a prerequisite to an award of punitive damages, and that the plaintiff bears the burden of presenting this evidence. The Supreme Court did not adopt any particular measure of a defendant's ability to pay and specifically declined to prescribe the measure of net worth. The court realized any particular method of measuring financial condition may not be appropriate in all cases. In any event, the decision now mandates that to sustain an award of punitive damages it must be supported by evidence in the record of a defendant's financial condition.

In a prior published opinion (*Douglas* v. *Ostermeier, ante,* p. 729 [2 Cal.Rptr.2d 594] we held the new rule announced by the high court in *Adams* v. *Murakami* should be given full retroactive effect. We found, although retroactive application would have a substantial detrimental effect on the administration of justice, fairness and public policy concerns did not compel the conclusion an exception to the general rule of retroactivity was warranted. (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147 [181 Cal.Rptr. 784, 642 P.2d 1305]; *Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059].) In *Douglas,* we found sufficient evidence of the defendants' financial condition was presented to the jury to further the dual purposes to be served by the new rule. As we noted in *Douglas,* "If evidence of financial condition was presented at trial, the purposes of the new rule have been served even without retroactive application of the *Adams* decision. But where there was insufficient evidence presented at trial to support the award of punitive damages, retroactive application of the *Adams* decision would further the purpose of meaningful appellate review and assure the punishment meted out to the defendant is neither inadequate nor excessive to fulfill the dual purposes of punishment and deterrence." (*Douglas* v. *Ostermeier, supra,* at pp. 745-746.)

This is such a case. Because inadequate evidence of defendant's financial condition was presented at trial, it is impossible to determine whether the $50,000 punitive damage award is disproportionate to the defendant's ability to pay the award. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910.)

Thus, the case at bar provides a proper example for retroactive application of the *Adams* rule.

As an experienced realtor, appellant opined the three-unit complex at 2134 Windsor Avenue had a market value of $200,000. After trial, and cancellation of the forged quitclaim deed, appellant's interest in this parcel of real property was reduced to half. When leased to tenants, these units rented for $575 and $550 a month respectively, generating approximately $13,000 annually.

There was also evidence appellant became the sole owner of the property she had jointly owned with Dankines in Val Verde. She testified the Val Verde property was improved with a single family residence and that they had purchased the property for $15,000 at a foreclosure sale in 1980. There was no testimony as to its present market or rental value.

Appellant testified she still drove one of the two Lincolns she and Dankines purchased during their relationship and that she sold Dankines' Lincoln after his death. Although there was considerable evidence at trial of how appellant paid all mortgages and living expenses from her separate bank account of income generated through real estate commissions, there was no evidence of how much money remained in bank accounts or any other evidence of appellant's present financial condition.

Based on the evidence presented at trial, appellant was worth approximately $125,000. Based on that evidence, a punitive damage award of $50,000 represents more than 30 percent of appellant's admitted worth. The Court of Appeal in *Devlin* v. *Kearney Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 390 [202 Cal.Rptr. 204], did a comprehensive analysis of the various ranges and ratios of punitive damages to compensatory damages and as a percentage of net worth of the defendant. That opinion acknowledged the calculation of punitive damage awards was a "fluid process" that "does not involve strict adherence to a rigid formula." (*Id.* at pp. 390-391.) In some cases, ratios of punitive damages to compensatory damages of as much as 2,000 to 1 were not considered excessive. (See, e.g., *Finney* v. *Lockhart* (1950) 35 Cal.2d 161 [217 P.2d 19] [2,000 to 1]; *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266 [95 Cal.Rptr. 678] [190.5 to 1]; *Wetherbee* v. *United Ins. Co. of America* (1968) 265 Cal.App.2d 921 [71 Cal.Rptr. 764] [476.2 to 1]; *Moore* v. *America United Life Ins. Co.* (1984) 150 Cal.App.3d 610 [197 Cal.Rptr. 878] [83.33 to 1]; see also *Greenfield* v. *Spectrum Investment Corp.* (1985) 174 Cal.App.3d 111, 124 [219 Cal.Rptr. 805] [award of $42,500 upheld against defendant who was "making $2,000 per month and owned an automobile"].) But in those cases where the measure of a defendant's

financial condition was his net worth, a review of the precedents revealed awards exceeding 15-35 percent of a defendant's net worth were considered excessive. (See, e.g., *Burnett* v. *National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1011-1012 [193 Cal.Rptr. 206] [35 percent of net worth excessive]; *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469-470 [136 Cal.Rptr. 653] [15 percent of net worth excessive]; *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416] [30 percent of net worth excessive].) Precise mathematical formulations do not exist in part because the reprehensibility of the actor's conduct is difficult to quantify and because what it takes to punish a given defendant's misconduct will vary from defendant to defendant.

A $50,000 punitive damage award may be the appropriate amount to punish appellant's misconduct in this case. But because of inadequate evidence in the record of appellant's actual financial condition, it is impossible to determine whether her net worth was only $125,000 or far greater than that amount. Moreover, it is impossible to know whether her annual income or other measure of her financial condition is substantial enough so that a $50,000 punitive damage award does not represent excessive punishment. Thus, retroactive application of the requirement of evidence of appellant's financial condition would be appropriate in this case to provide a sufficient basis for meaningful appellate review.

### DISPOSITION

The judgment as to the amount of punitive damages is reversed and remanded to the trial court for re-determination based on evidence of appellant's financial condition at the time of re-trial. (*Marriott* v. *Williams* (1908) 152 Cal. 705, 710 [93 P. 875] [financial condition at time of trial rather than at time of injury proper measure]; *Zadan* v. *Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821, 839 [161 Cal.Rptr. 225] [evidence of net worth at time of re-trial appropriate although considerably greater than at time of first trial].) In all other respects, the judgment is affirmed. Each party to bear its own costs of appeal.

Lillie, P. J., and Woods (Fred), J., concurred.