Filed 9/26/13  P. v. Segura CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROBERT K. SEGURA,<br><br>    Defendant and Appellant. | H037194<br>(Santa Clara County<br>Super. Ct. No. 210963) |

Defendant Robert K. Segura appeals from a judgment subjecting him to a commitment of indefinite duration as a sexually violent predator (SVP).  He contends that the governing statutes deprive him of equal protection insofar as they subject him to harsher treatment than is received by persons civilly committed under other statutes, who are entitled to periodic review and renewal of their commitment orders.  He also contends that the commitment order here denied him due process insofar as it rested on an invalid assessment protocol.  Finally, he contends that he was deprived of the equal protection of the laws, again by comparison to persons committed under other laws, when the trial court required him to testify over his assertion of a right not to do so.  We find no error with respect to the first two contentions.  We do not reach the merits of the third

contention because we find the record insufficient to sustain the necessary premise that the error, if any, was prejudicial. Accordingly, we affirm the order of commitment.

<h1 style="text-align:center">BACKGROUND</h1>

In October 1977, defendant[1] was convicted by plea on two counts of lewd and lascivious conduct upon a child, arising from incidents involving a nine-year old victim and an 11-year old victim. Both offenses were alleged to have occurred about two months after defendant's 18th birthday. By an order dated April 19, 1978, the court found him to be a Mentally Disorder Sex Offender (MDSO) under former sections 6300 et sequitur of the Welfare and Institutions Code, and committed him to a state hospital under those provisions.

In August 1997, defendant was convicted by a jury on four counts of lewd and lascivious conduct upon a single victim over a two-year period commencing when the victim was 13 years old. Defendant was sentenced to state prison for 17 years. He was due to complete his prison term on June 18, 2005. In anticipation of that event, the district attorney filed a petition to commit defendant under the Sexually Violent Predator Act, Welfare and Institutions Code sections 6600 et sequitur.[2] After a jury trial in June 2006, the court entered a two-year commitment order, which this court reversed in June 2008 on grounds of the erroneous exclusion of evidence. (*People v. Segura* (Mar. 14,

---

[1] The parties were designated in the pleadings below as "petitioner" and "respondent," but we shall refer to them as "plaintiff" and "defendant" to avoid confusion between appellate and trial designations.

[2] Except as otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

2008, H030416) [nonpub. opn.].)[3] On remand, the trial court conducted a second probable cause hearing, at which it received testimony from two evaluators, each of whom testified—if in one case only by implication—that his opinion was based upon an evaluation he had conducted under a Department of Mental Health protocol promulgated in February 2009. The court found probable cause and ordered a trial.

On July 9, 2010, defendant moved to dismiss the petition on the ground that the February 2009 protocol was invalid and that the evaluators' reliance on it violated defendant's statutory and constitutional rights, including the right to due process of law. The court denied the motion.

In anticipation of trial, plaintiff filed motions in limine asserting numerous propositions of law, including that "the People are entitled to call [defendant] as a witness" and, in doing so, to "question [him] as if under cross-examination" and to "impeach [him] with his felonies of moral turpitude." Defendant submitted a similar filing, contending among other things that he had "a right under the equal protection clause not to be called to testify against his will." The trial court denied the defense motion, and plaintiff was permitted to call defendant to testify in its case in chief.

The jury heard evidence over the course of five days. On July 14, 2011, after deliberating for one hour and 20 minutes, the jury returned a verdict sustaining the allegations of the petition. The court ordered defendant committed to the custody of the Department of Mental Health for an indefinite term, "subject to the ultimate decision in *People vs McKee*, (2010) 47 Cal.4th 1172." This timely appeal followed.

## DISCUSSION

---

[3] Shortly thereafter, by separate opinion, we reversed a post-judgment order "converting" defendant's two-year commitment order to an order of indefinite commitment. (*People v. Segura* (Jun. 5, 2008, H031871) [nonpub. opn.].)

3

**I.** *Validity of SVP Act*

   **A.  Equal Protection**

Defendant contends that the SVP Act violates his right to equal protection of the laws because of the disparity between the indeterminate commitment to which it subjects him and the finite commitments to which persons are subjected under otherwise similar civil commitment schemes, specifically those governing mentally disordered offenders (MDOs) and persons committed by virtue of a verdict of not guilty by reason of insanity (NGIs).

This issue has been widely litigated.  It reached the California Supreme Court in *People v. McKee*, *supra*, 47 Cal.4th 1172 (*McKee I*), where the court found that two threshold requirements for a successful equal protection claim were present, i.e., that SVPs are similarly situated to MDOs and NGIs, and that their commitment for an indefinite term constitutes injuriously disparate treatment.  (*Id*. at pp. 1203, 1202, 1207.)  As a result, it was incumbent upon the state to provide a justification for the difference in treatment, which it had yet to do.  (*Id*. at p. 1207.)  The court ordered the matter remanded to the trial court for further proceedings to determine whether an adequate justification exists.  (*Id*. at pp. 1208-1211.)  On remand the trial court concluded that the state had presented evidence sufficient to justify the challenged disparities.  The Court of Appeal affirmed that judgment, and the Supreme Court denied review.  (*People v. McKee* (2012) 207 Cal.App.4th 1325, review denied Oct. 10, 2012 (*McKee II*).)

Defendant filed his opening brief here after the Supreme Court issued *McKee I* but before the Fourth Appellate District issued *McKee II*.  At that time there was no citable appellate authority either way on the question whether the challenged disparities could withstand equal protection scrutiny.  Accordingly, defendant urged us to remand this matter to the court below for further proceedings like those ordered in *McKee I*.  After the

Fourth Appellate District issued *McKee II*, defendant sought and received permission to file a supplemental brief arguing that the case had been wrongly decided. We have concluded that the decision in that case must be deemed dispositive unless and until the Supreme Court directs otherwise.

It appears that the Supreme Court intended the determination on remand following *McKee I*, to be dispositive if affirmed on appeal, as to all cases raising the issues addressed there. In a number of other cases that raised substantially the same issues, the court granted review and retransferred the matters to the originating Courts of Appeal "with directions to vacate their prior opinions and suspend further proceedings until the *McKee I* remand proceedings were final, '*in order to avoid an unnecessary multiplicity of proceedings*.' [Citations.]" (*People v. McKnight* (2012) 212 Cal.App.4th 860, 863 (*McKnight*); see *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378 (*McDonald*).) This has led courts to conclude that the Supreme Court intended a final determination in *McKee* "not to be restricted to Mr. McKee alone," but to "appl[y] to the class of SVP's as a whole." (*McKnight*, *supra*, at pp. 863-864; *McDonald*, *supra*, 214 Cal.App.4th at p. 1378.) We further note that the high court's transfer orders in the cases cited in *McKnight*—and in other similar cases, including several in this court—contemplated potential review by the Supreme Court itself. That is, they abated the proceedings therein until the judgment in *McKee* had become final after "any proceedings in this court." (See *People v. Johnson* (2008) 162 Cal.App.4th 1263, review granted Aug. 13, 2008, S164377, *People v. Riffey*, review granted Aug. 20, 2008, S164711; *People v. Boyle* (2008) 164 Cal.App.4th 1266, review granted Oct. 1, 2008, S166167; *People v. Garcia* (2008) 165 Cal.App.4th 1120, review granted Oct. 16, 2008, S166682; *People v. Glenn* (2009) 178 Cal.App.4th 778, review granted Feb. 10, 2010, S178140; *People v. Rotroff*, review granted May 20, 2010, S178455; *People v. Schuler*, review granted Sept. 1, 2010,

S183062; *People v. Gomberg*, review granted Oct. 20, 2010, S185107; *People v. Purcell*, review granted Dec. 1, 2010, S186979.) This directive seems to contemplate that the lower courts in *McKee* would render a decision which, if not taken up by the Supreme Court for review, would itself decide on a statewide basis the issues addressed by them.

Given this background, it appears to us that the Supreme Court's denial of review in *McKee II* must be construed, in the absence of any indication to the contrary, as a tacit endorsement of that decision. The court itself has said that a denial of review is not "without significance." (*DiGenova v. State Board of Education* (1962) 57 Cal.2d 167, 178.) Here the significance is magnified by the court's directive to this court, and other courts entertaining similar challenges, to suspend proceedings until after "any proceedings in this court" in *McKee*. Where the court itself has acknowledged the statewide significance of a case by explicitly making its disposition a predicate for further proceedings in other matters around the state, we can hardly suppose that the court would deny review in that case if it doubted the correctness of its determination of the issues it had in common with those other cases.

We therefore reject defendant's constitutional challenges to the SVP act insofar as the same issues were addressed and decided in *McKee*.

### B. Other Challenges to Act

In his opening brief defendant challenged the 2006 amendments to the SVP Act on three additional constitutional grounds: (1) That their "retroactive" application to him violated due process; (2) that their provisions for indeterminate commitment and conditional release violated due process; and (3) that insofar as they may be applied to persons whose predicate offenses predated their enactment, they violate the federal constitutional prohibitions against ex post facto laws and being placed twice in jeopardy for the same offense. Defendant states that the Supreme Court decided these issues

6

against him in *McKee I*, *supra*, 47 Cal.4th 1172, but he nonetheless reiterates them here in order to preserve his rights to further review. As he acknowledges, we are bound by the decision in *McKee I* until such time as it is superseded by paramount authority. (*Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450, 455.) We therefore reject these arguments.

Defendant does raise one argument that was not addressed in *McKee*, though its precise content is difficult to ascertain. He asserts that the statutory amendments he challenges should only apply to *petitions filed* after their effective date, i.e., November 8, 2006.[4] He states that there were two petitions in this matter, "one . . . filed before the passage of Proposition 83 and one filed after." We find only one petition in the record, dated April 28, 2005. However it stands to reason that the plaintiff would have sought to amend the petition, if only to explicitly pray for the indeterminate commitment authorized by Proposition 83. In any event defendant's objection seems to be that the order may rest in whole or part on the earlier petition, and to that extent constitutes an improper retroactive application of the 2006 amendments to the statute.

This argument runs afoul of a series of obstacles. First, as we have noted, the record contains no later petition, but if one was filed, as defendant states, it would ordinary operate to *supersede* the earlier petition, negating one of the necessary premises of defendant's argument. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1187, p. 619; 4 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Pretrial Proceedings, § 243, p. 503.) Second, most of the changes made by Proposition 83 appear to be procedural in nature; as such, they would ordinarily apply in all matters pending when

---

[4] The amendments were made by Proposition 83, which was adopted at the general election of November 7, 2006. They therefore took effect on the following day. (Cal.Const., art. 2, § 10(a).)

7

they took effect, regardless of the dates on which matters were initiated.  (See *City of San Jose v. International Assn. of Firefighters, Local 230* (2009) 178 Cal.App.4th 408, 420, quoting *Dept. of Alcoholic Bev. Control v. Superior Court* (1968) 268 Cal.App.2d 67, 76 [" 'A statute affecting procedure or providing a new remedy for the enforcement of existing rights is properly applicable to actions pending when the statute becomes effective, provided that vested rights are not thereby impaired.' "].)

This rationale may not apply to the authorization for indeterminate commitments, because that change, while superficially remedial, must probably be considered substantive in effect.  (See *City of San Jose*, *supra*, at p. 420, quoting *Elsner v. Uveges* (2004) 34 Cal.4th 915, 936 [" 'In deciding whether the application of a law is prospective or retroactive, we look to function, not form.  [Citations.]  We consider the effect of a law on a party's rights and liabilities, not whether a procedural or substantive label best applies.' "].)  As to that aspect of the case, however, the real difficulty is not that the 2005 petition predated the amendment but that it failed to pray for the relief authorized by that amendment, and ultimately granted by the court below.  Defendant does not deny, and we see no reason to doubt, that the petition could have been amended to pray for such relief, and that such an amendment would have cured the retroactivity objection as framed by him.

It therefore appears that the only real difficulty in ordering an indefinite commitment based upon the 2005 petition is that the order awarded relief outside the pleadings.  However any appellate objection on that basis must also fail, because defendant apparently made no attempt to raise this issue in the trial court, where it might easily have been remedied by amendment (assuming, again, that it was not so remedied).  Whatever the state of the pleadings may have been, the parties tried the matter under the manifestly mutual supposition that a judgment for plaintiff would take the form of an

8

order of indefinite commitment.[5]  Under the "theory of trial" doctrine, where the parties

try a matter without objection on the mutual supposition that a given issue is presented or

remedy sought, no appellate relief can be obtained merely because the pleadings were not

formally amended to raise that issue or pray for that remedy.  (See 9 Witkin, Cal.

Procedure (5th ed. 2008) Appeal, §§ 407-409, pp. 466-469.)

We conclude that defendant has failed to establish error in the court's application

of the 2006 amendments to the SVP Act.

## II.  *RELIANCE ON INVALID PROTOCOL*

### A.  *Introduction and Procedural Context*

Defendant contends that the proceedings were marred because the psychological

evaluations underlying the present proceedings were prepared in reliance on an

assessment protocol that, according to defendant, did not conform to statutory

requirements.  In essence, he contends that the protocol at issue is too vague and allows

---

[5]  Thus, in a memorandum in support of a motion to dismiss the petition on other grounds, defense counsel described the general effect of the SVP Act as follows: "The . . . Act . . . provides for the involuntary civil commitment of certain offenders, following the completion of their prison terms.  [Citation.]  As of November 2006, that commitment is for an indefinite term.  [Citation.]"  (Fn. omitted.)  Two pages later appears the statement that "[w]here the requisite SVP findings are made, 'the person shall be committed for an indeterminate term . . . .' "  Similar statements by counsel for plaintiff passed without defense objection.

Even more tellingly, in a "Waiver of Appearance and Speedy Trial" dated June 12, 2009, defendant acknowledged in writing that "the Office of the District Attorney . . . has filed a petition to commit me to the custody of the State Department of Mental Health for an indeterminate term pursuant to Welfare and Institutions Code §§ 6604 and 6604.l."  He also acknowledged that pursuant to Proposition 83, "the law now provides for commitment to an indeterminate term in the state hospital upon a finding by court or jury that I am a 'sexually violent predator' within the meaning of Welfare and Inst Code §§ 6600, et seq."

too much latitude to evaluators in determining whether a subject meets the statutory criteria for commitment, thereby infecting the entire procedure with an intolerable degree of arbitrariness. We conclude that (1) insofar as the objection is founded upon a claimed noncompliance with the governing statute, it is not available on appeal from the ensuing judgment, but was reviewable only by pretrial petition for extraordinary relief; and (2) insofar as the objection rests on a claimed denial of due process, this record is insufficient to sustain the necessary premise that a more specific and detailed protocol is necessary to satisfy the demands of due process of law.

An SVP proceeding involves a series of steps which may be classified for present purposes into three phases: the correctional screening, the psychological evaluation, and the judicial proceeding. In the screening phase, correctional authorities determine whether the defendant is "likely to be a sexually violent predator." (§ 6601, subd. (b); former § 6601, subd. (c), as amended by Stats. 2008, ch. 601, § 2.) If they conclude that he is, they refer the matter to the State Department of Mental Health for the second phase, "a full evaluation of whether the person meets the criteria in Section 6600."[6] (§ 6601, subd. (b).) In this phase, the defendant is separately evaluated by two licensed mental health professionals. (*Ibid*.) If they "concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without

---

[6] At the time of the relevant proceedings here, the agency responsible for conducting the evaluations was the Department of Mental Health. (Former § 6601, subd. (c), as amended by Stats. 2008, ch. 601, § 2.) In 2012 the statute was amended to make the Department of State Hospitals the responsible agency. (§ 6601, subd. (c), as amended by Stats. 2012, ch. 24, § 139.) By its terms, however, that amendment was repealed no later than January 1, 2013. (*Id*., subd. (m)(3).) As of that date, responsibility apparently reverted to the Department of Mental Health. (§ 6601, subd. (m), as amended by Stats. 2011, ch. 359.) Since the identity of the responsible agency is not material to this appeal, we will refer to it simply as "Department."

appropriate treatment or custody," the Director of the Department promulgates a request that a commitment petition be filed.[7] (*Id*., subds. (d), (h), (i).) The Director submits this request, along with "[c]opies of the evaluation reports and any other supporting documents," to the county attorney or the district attorney of the county where the most recent prison sentence was pronounced. (*Id*., subds. (h), (i).)

If the designated public attorney "concurs with the [Director's] recommendation," he or she files a petition for commitment in the local superior court. (§ 6601, subd. (i).) This commences the third and most important phase of the matter—the judicial stage, in which the merits of the petition are addressed in three successive steps. First the court is required, on request, to determine whether the petition, on its face, supports a finding of a "probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6601.5.) If the court finds the petition sufficient, it issues an order for the defendant's temporary detention "in a secure facility." (*Id*.; see *People v. Hayes* (2006) 137 Cal.App.4th 34, 42) Within 10 days of such a detention order, the court must conduct a "probable cause hearing." (§§ 6601.5, 6602.) This resembles a preliminary hearing in a criminal case, in that its purpose is to "test the sufficiency of the evidence supporting the SVPA petition," in order to " ' " 'weed out groundless or unsupported charges . . . and to relieve the accused of the degradation and expense of a . . . trial.' " ' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 247 (*Cooley*), quoting *Nienhouse v. Superior Court* (1996) 42

---

[7] If the two initial evaluators do not concur, the director designates two "independent professionals" to conduct additional evaluations. (§ 6601, subd. (e).) In that case a petition "shall only be filed if both independent professionals who evaluate the person pursuant to subdivision (e) concur that the person meets the criteria for commitment." (*Id*., subd. (f).)

Cal.App.4th 83, 91; see *In re Parker* (1998) 60 Cal.App.4th 1453, 1468-1469.) Toward that end the court " ' "may weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses." ' " (*Cooley*, *supra*, 29 Cal.4th at p. 257.) The ultimate question is "whether a reasonable person could entertain a strong suspicion that the offender is an SVP." (*Id.* at p. 252, italics omitted.) If this question is answered affirmatively, the matter is referred for a trial at which the question is "whether, beyond a reasonable doubt, the [defendant] is a sexually violent predator." (§ 6604.) Among other rights, the defendant is entitled to trial by jury and a unanimous verdict. (*Id*., § 6603. subds. (a), (f).)

In this larger procedural context, the "standardized assessment protocol" challenged by defendant plays a rather limited role. Its primary statutory function is to guide the two professional evaluators in preparing the psychological evaluations which will in turn generally determine whether a petition is filed.[8] The pertinent statutory language appears as follows: "The State Department of Mental Health shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health, to determine whether the person is a sexually violent predator as defined in this article. The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of

---

[8] We say "generally" because it is open to the Director to secure additional evaluations. (§ 6601, subds. (e)-(g).) Indeed, it may be open to the Director to recommend the filing of a petition even without supporting evaluations, provided the non-supporting evaluations are attached to the petition, which can then be "defend[ed]" on the ground that the evaluations are "infected by legal error." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 913.)

12

sexual deviance, and severity of mental disorder." (§ 6601, subd. (c); see former § 6601, subd. (c).)

So far as the statute is concerned, the psychological evaluations have largely completed their function when their conclusions trigger, or fail to trigger, a request by the Director to commence judicial commitment proceedings. The evaluations are mentioned, and minor additional roles are expressly or impliedly assigned to them, at a few other points in the SVP Act. Thus the statute specifies that "[c]opies of the evaluation reports and any other supporting documents shall be made available to the attorney designated by the county," presumably so that he or she may examine them in deciding whether to commence a judicial proceeding. (§ 6601, subd. (d); see *id*., subd. (h).) Evaluations are also mentioned as a type of "documentary evidence" that may be relied upon to prove the fact and circumstances of a prior conviction. (§ 6600, subd. (a)(3).) And although the statute does not require it, the Supreme Court has counseled that the supporting evaluations "should . . . be attached to the petition," so that the defendant may "challeng[e] the petition's validity on grounds that one or more of the supposedly concurring reports are infected by legal error." (*People v. Superior Court (Ghilotti)*, *supra*, 27 Cal.4th at p. 913, fn. omitted.) A number of cases also suggest, though mostly in dicta, that "hearsay evidence," which includes psychological evaluations, is admissible at the probable cause hearing to establish probable cause for a trial. (See *Cooley, supra,* 29 Cal.4th 228, 245, fn. 8, citing *In re Parker* (1998) 60 Cal.App.4th 1453, 1469-1470 ["the petitioner is allowed, despite their hearsay nature, to present the contents of any reports that form the basis of the petition as evidence"]; see also *People v. Butler* (1998)

13

68 Cal.App.4th 421, 434; *People v. Hayes, supra,* 137 Cal.App.4th 34, 43; *People v.*
*Superior Court (Preciado)* (2001) 87 Cal.App.4th 1122, 1130, fn. 2.)[9]

For the most part, however, an evaluation has fulfilled its statutory function when
the Director recommends, or fails to recommend, that a petition be filed. "The filing of
the petition initiates a new round of proceedings," in which the ultimate question is not
whether the requisite evaluations have been performed but whether the state can establish
" 'the more essential fact that the alleged SVP is a person likely to engage in sexually
violent predatory criminal behavior.' " (*In re Wright* (2005) 128 Cal.App.4th 663, 672,
quoting *People v. Superior Court (Preciado), supra,* 87 Cal.App.4th 1122, 1130.)
Whether or not the reports themselves are admitted into evidence, their authors must—to
the extent their opinions form part of the petitioner's case—be made available for cross-
examination. (*People v. Hayes, supra,* 137 Cal.App.4th 34, 43; *Cooley*, *supra*, 29 Cal.4th
at p. 245, fn. 8; *In re Parker*, *supra*, 60 Cal.App.4th at p. 1470.) In addition, the
defendant is entitled to retain his own psychological experts to examine, and if possible
rebut, the evaluators' findings and conclusions. (See § 6603, subd. (a).)

---

[9] Ordinarily, any writing, including a written report, is objectionable as hearsay if
offered to prove the truth of its contents. (See Evid. Code, § 1200; 1 Witkin, Cal. Evid.
(5th ed. 2012) Hearsay, § 12, p. 796.) However, portions of a report may be admissible
either because not offered for the truth of the matter asserted (see Evid. Code, § 1200), or
because they come within an exception. Perhaps the most likely exception here is the one
applying to statements by a public employee, which may be admissible under Evidence
Code section 1280 under the conditions specified there. (See *People v. Monreal* (2006)
52 Cal.App.4th 670, 674-679 [defendant's own statements, recounted in probation report,
were properly admitted as statements by a party contained in a record by a public
employee], disapproved on another point in *People v. Trujillo* (2006) 40 Cal.4th 165,
178-179, 181, fn. 3.) Those conditions, however, might often be lacking for most of the
typical contents of such a report. (See *People v. Reed* (1996) 13 Cal.4th 217, 230-231
[excerpt from probation report was inadmissible "multiple hearsay"]; *Monreal*, *supra*, at
p. 677.)

14

### B. Noncompliance With Statutory Requirement

Defendant contends that the protocol under which he was evaluated did not constitute a "standardized assessment protocol" as required by the statute.  The argument basically depends on defining the quoted term to mean something more detailed and specific than the 2009 Protocol.  We do not decide the soundness of defendant's definitional argument because evaluation under a noncompliant protocol would constitute an error that was ripe for appellate review prior to trial.  Since no attempt to secure pretrial review was made, the claimed error cannot furnish a basis for reversal on appeal.

That the claimed error was ripe for review prior to trial can hardly be doubted.  It appeared from the testimony at the probable cause hearing that both evaluators had relied upon the 2009 protocol in their most recent evaluations of the plaintiff.[10]  The evaluations were admitted into evidence at that hearing and manifestly formed the core of the evidentiary foundation for the finding of probable cause.[11]  Defendant in fact challenged the evaluations prior to trial by moving to dismiss the petition on the ground that the evaluations were conducted pursuant to an invalid protocol, thereby violating defendant's "statutory and constitutional rights."  That motion was denied two weeks before the court selected an initial trial date, nearly three months before the trial date initially set, and

---

[10] Evaluator Selby affirmed that in his 2009 updated evaluation of defendant, he followed the 2009 protocol.  Due to an apparent oversight, evaluator Arnold was not asked that precise question; he was only asked to affirm, as he did, that "two of [his] three reports would have been written after that protocol was enacted."  We think it was implicit in this testimony that Arnold too had relied on the 2009 protocol in conducting these more recent evaluations.  Both evaluators testified that the conclusions they reached in their pre-2009 evaluations would not have been altered by reliance on that protocol.

[11] The challenged evaluations were admitted in evidence—without objection—at the probable cause hearing.  They were not admitted, and apparently not offered, at trial.

15

nearly nine months before trial actually commenced. No apparent attempt was made to seek appellate review of that ruling.

In *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 (*Pompa-Ortiz*), the California Supreme Court held that unless a pretrial defect is "jurisdictional in the fundamental sense," it will not support reversal on appeal from a judgment of conviction without a showing that it deprived the defendant of a fair trial or otherwise inflicted prejudice. (*Id*. at p. 529.) "The right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities. At that time, by application for extraordinary writ, the matter can be expeditiously returned to the magistrate for proceedings free of the charged defects." (*Ibid*.) "In other words, a defendant who feels he has suffered error at his preliminary hearing can seek to correct that error by filing a pretrial writ petition. If he does not, and elects to go to trial, the error at the preliminary hearing can only lead to reversal of the conviction if the error created actual prejudice." (*People v. Hayes* (2006) 137 Cal.App.4th 34, 50.) This rule has been applied to SVP proceedings, and specifically to an objection that the defendant was evaluated under an invalid assessment protocol. (*Id.* at pp. 517-518.)

Defendant seeks to avoid the rule of *Pompa-Ortiz* by asserting that "[f]ailure to standardize the protocol used to assess potential SVP committees results in an arbitrariness that infects the entire system, including the jury trial." We find it impossible to see how the evaluators' application of a supposedly noncompliant protocol could be said to "infect[]" the trial, particularly where the evaluations were not in evidence and cannot otherwise be readily understood as having contributed to the verdict. Defendant's naked suggestion to the contrary will not suffice to remove this case from the rule of *Pompa-Ortiz.*

16

To make the claimed noncompliance with statute cognizable on this appeal, defendant had to demonstrate either that it was "jurisdictional in the fundamental sense" or that it inflicted prejudice in the sense that an evaluation conforming to his conception of statutory requirements would have been reasonably likely to produce a result more favorable to him.  He has demonstrated neither premise.  We therefore conclude that the asserted failure to conduct the evaluations under a conforming assessment protocol, insofar as it rests on a violation of statute, cannot furnish a basis for reversal on appeal from the order of commitment.

### C.  Due Process

#### 1.  *Allen* Factors

The preceding conclusion leaves only defendant's claim that his evaluation under the challenged protocol infected the proceedings with such a degree of arbitrariness as to breach the constitutional guarantee of due process of law.  He bases his argument on the balancing test developed by courts to resolve questions of "what process is due" in a particular adjudicative setting.  (*Morrisey v. Brewer* (1972) 408 U.S. 471, 481; *People v. Otto* (2001) 26 Cal.4th 200, 210; *People v. Allen* (2008) 44 Cal.4th 843, 863 (*Allen*).)  We need not examine his criticisms in detail, because the present record is insufficient to sustain any due process challenge to the existing protocol.

As stated in *Allen*, *supra*, 44 Cal.4th at pages 862-863, the question of " ' "what process is due" ' " is to be determined by evaluating the following factors:  " '(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing

17

individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official.' " As will appear, the first of these factors lends some support, albeit comparatively weak, to defendant's argument; the fourth gives no support at all; and the second and third do not sufficiently appear on this record to permit their reliable assessment.

## 2. Defendant's Stake

Defendant overstates the interest at stake—the first of the *Allen* factors—by equating his position to that of the defendant in that case. He paraphrases a passage in which the court wrote, "As we noted in [*People v.*] *Otto*, *supra*, [(2001)] 26 Cal.4th 200, [210], 'the private interests that will be affected by [a finding that the defendant continues to be a sexually violent predator] are the significant limitations on [the defendant's] liberty, the stigma of being classified as [a sexually violent predator], and subjection to unwanted treatment. [Citation.]' " (*Allen*, *supra*, 44 Cal.4th at p. 863.) The bracketed material is not ours; it was inserted by the *Allen* court. It is omitted, however, from defendant's version of this statement. Yet it is critical to a proper understanding of the quoted passage, for it attributes the enumerated effects to a "*finding* that the defendant continues to be a sexually violent predator." (*Ibid*.; italics added.) In defendant's version, the stakes at issue in *Allen* are present throughout the "context of SVP commitments." This is true only in the purely mechanistic sense that every step and aspect of an SVP proceeding has the potential to advance the matter, however incrementally, toward an adjudication of SVP status. But this cannot mean that the defendant's stake in every detail of the commitment process has the same weight as the stake considered in *Allen*. Rather, when compared to the interests affected there, defendant's stake in the assessment protocol—and any evaluation based on it—is considerably attenuated.

18

The question in *Allen* was whether the constitutional guarantee of due process entitled the defendant to *testify at trial* over his attorney's opposition. The trial, of course, is intended to produce an immediate and final *decision* whether the defendant is in fact an SVP. An affirmative finding results in commitment forthwith "for an indeterminate term . . . for appropriate treatment and confinement in a secure facility." (§ 6604.) The loss of liberty, stigma, and subjection to treatment described in *Allen* are thus the direct and immediate results of the procedure there under scrutiny, i.e., trial. At stake are, in the familiar phrase, all the marbles.

A defendant's stake in a psychological assessment protocol, valid or otherwise, cannot be equated to his or her stake in testifying at trial. The protocol cannot by itself produce or forestall an adjudication of SVP status, or the resulting commitment order. Indeed, as we have already noted, it has little direct role in the judicial phase of the proceeding; its chief function is only to guide the psychological evaluators in determining, at the preliminary, evaluative phase of the proceeding, whether the defendant appears to possess the characteristics of an SVP. As previously discussed, their reports will tend to determine whether a judicial proceeding is *commenced*; they may also furnish evidence of the defendant's prior offenses, and thus play some evidentiary role in a trial. (§ 6600, subd. (a)(3).) In other respects, however, they are likely to be objectionable as hearsay and to come before the jury, if at all, only as a starting point for defense efforts to impeach the plaintiff's experts. (See fn. 9, *ante*, and accompanying text.)

Further, the precise question here is not the defendant's stake in the written evaluations but his stake in the *protocol* pursuant to which the evaluations are prepared. That fact removes the challenged procedure even farther from the final result. As we understand defendant's somewhat nebulous objections, he does not suggest that the

19

protocol will affirmatively induce evaluators to reach erroneous or unreliable results. Rather, he contends only that it *permits* such results by providing insufficient guidance to prevent them. So far as defendant has shown, each evaluator remains free to apply methods and measures that would be entirely consistent with, or mandated by, a protocol complying with defendant's standards. Moreover each evaluator's opinion remains open to controversion on the ground, among others, that the methods and standards used to reach it are unsound, whether or not they conform to the governing protocol.

All that appears to be truly at stake is the *possibility* that an evaluation will be conducted with insufficient guidance and that, as a result, a judicial proceeding will be commenced, and a trial perhaps conducted, when evaluations conducted under a different protocol might have freed the defendant from confinement upon completion of his prison term. The chief harm threatened by this possibility is the defendant's continued detention *pending trial*. This is a serious deprivation of liberty, but obviously a lesser one than the indefinite detention that will result from a final SVP finding. (See *Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 113 ["In determining what process is due, account must be taken of the length and finality of the deprivation . . ."].) And while the mere commencement of SVP proceedings may inflict some degree of social stigma, it cannot be compared to the stigma of a formal, final adjudication adverse to the defendant.

In all these respects, defendant's stake in the assessment protocol is slighter or more attenuated than the defendant's stake in *Allen*. It is true that the protocol is intended to guide one of the earliest steps on the road to an SVP adjudication. But it cannot by itself be said to bring the defendant nearly as close as the procedure challenged there did to the adverse results weighed in *Allen*, i.e., indefinite confinement, judicially confirmed stigma, and statutorily prescribed treatment. The harms to which a defendant is exposed

20

by an assessment protocol may be comparable in *kind* to the harms at issue in *Allen*, but they cannot be said to possess nearly the same weight in determining what process was due at the challenged point in the proceeding.   Thus, while the first *Allen* factor weighs in defendant's favor, it possesses substantially less gravity than it did in that case.

### 3.  Risk of Error in Comparison to Competing Procedures

Turning to the second factor, " 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards' " (*Allen*, *supra*, 44 Cal.4th at p. 862), we find the present record insufficient to support a determination in defendant's favor.  Defendant asserts that the purpose of the statutory requirement of a standardized protocol is "[t]o help prevent arbitrary governmental action in the commitment of SVPs."  He argues somewhat obliquely that the 2009 protocol cannot achieve this objective because "[i]f each evaluator is free to employ whatever evaluation method he or she chooses, there is no assurance that the method chosen will be proper or reliable."  Quoting *People v. Superior Court (Gary)* (2000) 85 Cal.App.4th 207, 216 (*Gary*), he writes, " '[A]bsent any standards, the director's decision will be completely discretionary and could lead to unchecked abuse and arbitrary results.' (*Ibid*.)  Thus, 'it is highly unlikely the Legislature intended an arbitrary application' as to those subject to commitment.  (*Ibid*.)"

The quoted comments from *Gary* were part of a discussion of a hypothetical regime under which a petition to extend an SVP commitment could be based solely upon the recommendation of the Director of Mental Health, with *no* supporting evaluations of the defendant's current mental condition.  When the petition for recommitment there was filed, it was accompanied only by an evaluation recommending *against* recommitment. The petition was ultimately supplemented with a second evaluation reaching the opposite conclusion, but the plaintiff's reading of the statute, if accepted, would have vested the

21

Director with the sole unfettered discretion to recommend a recommitment petition—and the responsible public attorney with the power to act on that recommendation—without securing *any* supporting professional opinion.

It was this theoretical regime, implicitly advocated by the plaintiff in *Gary*, that the court denounced for vesting unfettered discretion in the Director. Defendant's reliance on these comments tacitly equates an assertedly deficient *protocol* with a procedure requiring *no evaluation*. A protocol that furnishes less guidance than defendant deems appropriate, or that allows more latitude to individual evaluators than he may find prudent or necessary, can hardly be equated with a regime that permits the Director, in his discretion, to forego or disregard evaluations entirely.

More to the point, an argument equating two such regimes hardly satisfies the directive in *Allen*, *supra*, 44 Cal.4th at page 862, that we compare " 'the risk of an erroneous deprivation' " under the *existing* procedure to the risk under one or more *alternative* procedures. This directive seems to require an assessment of the existing protocol in contrast to a concrete proposal for an alternative protocol. Defendant has put forward no alternative more concrete than his demand for a "sufficiently standardized protocol" so that the outcome will "not depend on the luck of the draw regarding which evaluator is assigned." He has provided no basis on which to suppose that a protocol satisfying such nebulous demands for specificity exists, or could exist—let alone that its advantages, when weighed against its disadvantages, favor its adoption.

In the court below defendant offered declarations by mental health professionals to the effect that the 2009 protocol lacked various features or characteristics that medical or scientific practitioners would expect to find in a "standardized protocol" within their own disciplines. No example was offered of an accepted protocol in the context of SVPs or indeed of psycho-sexual disorders or conditions of any kind. This omission is telling

because, as one of defendant's declarants acknowledged, the 2009 protocol explains its lack of greater specificity by stating that it "is not and cannot be, a detailed, precise step by step procedure.' "  He characterized the protocol as "argu[ing] that this type of standardization is impossible because step by step procedures are only attainable by the physical sciences."[12]  He declared this supposed premise "specious" because he himself had furnished, earlier in the declaration, "an example of intellectual assessment . . . which illustrate[s] that step by step procedures may be realized within the field of psychology as well."  This was an apparent reference to earlier paragraphs giving the example of "a child who does not seem to be benefiting from school," and discussing the methods and measures that might be included in a protocol designed to determine, apparently, whether a diagnosis of mental retardation is appropriate.

We emphatically reject the notion that the 2009 protocol can be invalidated merely because it bears insufficient resemblance to the methods that might be employed to determine the causes of a child's underperformance at school.  If defendant wished to take issue with the protocol authors' assertion that more specific guidelines were impracticable, it was incumbent upon him to substantiate his challenge—if not with a proposed alternative protocol, at least with examples of allegedly superior guidelines. Evidence that other kinds of psychological or cognitive assessment may be conducted within guidelines more specific than those offered by the 2009 protocol is scarcely more pertinent than evidence that specific protocols exist to determine the composition of a physical substance or the velocity of an astronomical object.  For purposes of weighing

---

[12]  In fact the protocol states, "Since the exercise of independent, professional clinical judgment is required, this evaluation protocol is not, and cannot be, a detailed, precise step-by-step procedure *like the kind of procedure that might apply to the chemical analysis of an unknown substance*."  (Italics added.)

the second *Allen* factor, the question is not whether better procedures might exist for determining something else, but whether better procedures exist for arriving at a preliminary determination whether a convicted sex offender is an SVP.  In the absence of some credible demonstration that some such alternative procedure exists, the second factor can hardly be enlisted in support of invalidating the existing procedure.[13]

### 4.  State's Interest in Existing Procedure

Our analysis of the second *Allen* factor anticipates our analysis of the third, which is " 'the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (*Allen*, *supra*, 44 Cal.4th at p. 862.)  Without some reasonably concrete proposed "additional or substitute" procedure to which to compare the existing protocol, there is no no way to determine the extent to which such a procedure might implicate the state's interests in the matter.  Accordingly it cannot be said that this factor supports defendant's due process challenge.

### 5.  Dignitary Interest

Nor does defendant's argument find support in the fourth *Allen* factor, " 'the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in *enabling them to present their side of the story* before a responsible

---

[13] Similarly, though in a somewhat different context, the First Appellate District held that a defendant challenging an assertedly invalid assessment protocol could not prevail without showing a reasonable probability that if evaluated under a valid protocol, "he would have been screened out or otherwise would have been found not to be an SVP." (*People v. Medina* (2009) 171 Cal.App.4th 805, 820, fn. omitted.)  Here both of plaintiffs' experts reached the same conclusions under the 2009 protocol that they had reached under the only alternative protocol, i.e., the pre-2009 protocol.  Defendant points to nothing in the record indicating that they would have reached different results under any plausible alternative protocol.

government official.' " (*Allen*, *supra*, 44 Cal.4th at pp. 862-863; italics added.) That factor appears to be implicated only where the claimed procedural deficiency impinges upon the challenger's *notice* of proposed state action or the *opportunity to be heard* with respect to it. This factor played a prominent and perhaps decisive role in *Allen*, where the court noted that preventing the defendant from testifying could impair his "ability to present his or her side," relegating him "to the role of a mere spectator, with no power to attempt to affect the outcome." (*Id.* at pp. 868, 869.) Indeed, because he had no right to remain silent, he "might be . . . forced to testify as to matters the prosecution seeks to establish," while being "prevented from testifying as to matters the defendant seeks to establish." (*Id.* at p. 869.) This "dignitary interest" was not lessened by the fact that he "m[ight] fare better by remaining silent," for "[t]he government has no interest in assuming a paternal role to prevent a defendant from pursuing a strategically misguided path in a proceeding under the SVPA." (*Ibid*.)

Defendant cites no analogous interest here. Instead he seeks again to extrapolate such an interest from the analysis in *Allen*, and particularly its statement that among the SVP Act's " 'built-in procedural safeguards to protect the dignitary interest' " is the requirement that proceedings be commenced " 'by a petition supported by concurring opinions of two psychologists . . . .' " (*Allen*, *supra*, 44 Cal.4th at p. 868, quoting *People v. Fraser* (2006) 138 Cal.App.4th 1430, 1448.) It may be true that the required evaluations serve the defendant's interest in *notice* insofar as they provide an early indication of the psychological analysis on which the state is likely to rely to establish its case at trial. But it hardly follows that compliance with any particular *assessment protocol* will advance that interest to any ponderable extent. The defendant's interest in notice would seem to be served when the evaluations are provided to him (or his attorney). Nothing about their contents—including their compliance or noncompliance

25

with any real or posited assessment protocol—can be said to directly implicate the dignitary interest in notice and hearing.

We conclude that while the first *Allen* factor may have some weight in determining what process is due with respect to an assessment protocol or an evaluation conducted under it, that weight is significantly diminished by the numerous mediating forces between the application (or misapplication) of the protocol and the impairment of interests contemplated in *Allen*. Moreover, the present record fails entirely to establish that either the second or third factor favors defendant's argument, and tends to affirmatively demonstrate that the fourth factor does not. As a result, defendant has failed to show that evaluation under a protocol other than the 2009 one is mandated by the due process clause of the state or federal constitution.

## III. *COMPELLED TESTIMONY*.

Prior to trial defendant asserted, by motion in limine, "a right under the equal protection clause not to be called to testify against his will." The court denied the motion, stating, "The fact that the respondent may be called as a witness does not violate equal protection." At trial, counsel for plaintiff called defendant to the stand and examined him extensively concerning his personal history and other subjects. Defendant contends that compelling him to testify in this manner violated his right to equal protection of the laws, since at least some other defendants in commitment proceedings have been held entitled to refuse to testify. Those holdings, however, have failed to command unanimous assent among the courts of appeal. We find it unnecessary to enter the resulting controversy, because we find the present record insufficient to establish that defendant suffered any prejudice from being required to testify at plaintiff's behest.

By their terms, the federal and state constitutional guarantees against self-incrimination speak only in terms of criminal proceedings. (U. S. Const., amend. V; Cal.

26

Const., art. I, § 15, cl. 6.) It is settled that the right of a criminal defendant to refuse to testify, and to avoid any adverse inference from doing so, is not available to the defendant in civil commitment proceedings under either the Fifth Amendment or the due process clause as applied to the states. (*Allen v. Illinois* (1986) 478 U.S. 364, 369, 374; see *People v. Leonard* (2000) 78 Cal.App.4th 776, 789-790 [applying *Allen* to SVP commitment proceeding]; *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [no right to refuse to testify in proceeding for commitment as person dangerous to self or others by reason of mental retardation]; *People v. Merfeld* (1997) 57 Cal.App.4th 1440, 1446 [same, commitment under Mentally Disordered Offender law].)[14]

Defendant does not contest these holdings, or their applicability here. He contends instead that because the defendants in some other civil commitment proceedings have been held to have a *statutory* right to refuse to testify, failure to recognize a comparable right in him denies him the equal protection of the laws.

An equal protection challenge is analyzed by first identifying the benefit claimed by the challenger, or the burden of which he seeks to be relieved. The court must then determine whether the challenger is suffering disparate treatment with respect to that benefit or burden, i.e., whether there exists an identifiable class of persons who receive that benefit, or are excused from that burden. The next question is whether the challenger is situated similarly to members of the identified class with respect to the interests affected by the disparate treatment. If so, the question becomes whether the disparity is

---

[14] As the court observed in *People v. Merfeld, supra*, 57 Cal.App.4th at p. 1446, the "absolute right" of a criminal defendant "to refuse to testify" must be distinguished from the right of a witness *not to answer incriminating questions*. (See *Cramer v. Tyars*, *supra*, 23 Cal.3d at p. 137.) The latter right is available "in any proceeding, *civil or criminal.*" (*Ibid.*, italics in original.) Only the right not to testify is at issue here.

justified by an adequate governmental interest—in some cases, a compelling state interest; in others, a merely rational basis. If no such interest is identified, an equal protection challenge is made out, leaving only the question of an appropriate remedy. The first premise of defendant's argument is that the subjects of some other civil commitment proceedings enjoy a right to refuse to testify. Such a right, grounded in statute, was first recognized in *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1226 (*Haynie*). The defendant there appealed from an order extending his commitment under a verdict of not guilty by reason of insanity (NGI). The court held that he had a right to refuse to testify under a statutory provision stating, "The [defendant] shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees." (Pen. Code, § 1026.5, subd. (b)(7).) The court reasoned that since the defendant in a criminal prosecution has the right to refuse to testify, the statute had the effect of extending the same right to defendants in NGI proceedings.

Shortly after deciding *Haynie*, the same court reached the same conclusion with respect to proceedings to extend the detention of persons committed under the Juvenile Court Law to what was then known as the California Youth Authority. (*In re Luis C.* (2004) 116 Cal.App.4th 1397, 1399 (*Luis C.*).) The governing statute, sometimes known as the Extended Detention Law (EDL), contained a provision stating, "The [defendant] shall be entitled to all rights guaranteed under the federal and state constitutions in criminal proceedings." (Welf. & Inst. Code, § 1801.5.) The court held that in the absence of some legislative indication to the contrary, this language must be understood to include the right of a criminal defendant not to testify, and the concomitant right not to suffer any adverse inference from a refusal to do so.

28

Defendant reasons that because the statutes in NGI and EDL proceedings grant a right to refuse to testify, the same right must be extended to defendants in other civil commitment proceedings. Respondent asserts, however, that the above decisions are mistaken and that SVP defendants are not similarly situated to NGI and EDL defendants for purposes of a right not to testify. On the first point respondent notes that another court has rejected an argument like defendant's, in a commitment proceeding under the Mentally Disordered Offender (MDO) law, on the ground that *Haynie* and *Luis C.* were wrongly decided and that the statutory language relied on there was intended only to conform the statutes to judicial authority holding certain features of criminal prosecutions constitutionally mandated in civil commitment proceedings. (*People v. Lopez* (2006) 137 Cal.App.4th 1099, 1113-1115 (*Lopez*).) Since this conclusion eliminated the disparity on which the defendant's argument was predicated, it defeated his claim of error.

The *Lopez* decision itself came under fire in *Joshua D. v. Superior Court* (2007) 157 Cal.App.4th 549, 561, where Division Three of the Fourth District "agree[d] with *Luis C.* that the plain language employed by the Legislature in section 1801.5 requires the conclusion that juveniles facing commitment under that provision may decline to testify." (*Id.* at p. 558.) The court placed considerable emphasis on the breadth of the governing statute, with its reference to " 'all' " rights constitutionally guaranteed to criminal defendants. (*Id.* at p. 556, quoting Welf. & Inst. Code, § 1801.5.) The court cited *In re Anthony C.* (2006) 138 Cal.App.4th 1493, where a divided court held that the term "all" must be literally applied, so that it barred retrial under the rule against double jeopardy when an order extending a CYA commitment was reversed for insufficiency of the evidence.

We find it unnecessary to enter this fray because we are satisfied that any error in requiring defendant to testify was harmless under the standard prescribed by *People*

29

*v.Watson* (1956) 46 Cal.2d 818, 836.  That this is the governing standard follows from the fact that the claimed error—compelling defendant to testify—rests on a right granted by state law.  This in turn follows because, by adopting defendant's argument, we would in effect be *reforming* the SVP law to incorporate a right granted by the statutes governing NGI and EDL proceedings.  "[A] court may reform—i.e., 'rewrite'—a statute in order to preserve it against invalidation under the Constitution, when [the court] can say with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute."  (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 660-661.)  A right thus judicially engrafted onto a statute must itself be considered a rule of state law, even though it grows out of constitutional concerns.  Judicial errors in its observance must therefore be tested under a *Watson* standard.

An error subject to this standard can warrant reversal only if it appears "reasonably probable that a result more favorable to defendant would have been reached in the absence of the error."  (*People v. Gonzales* (2013) 56 Cal.4th 353, 388; see *People v. Letner* (2010) 50 Cal.4th 99, 195 [defendants did not show that conducting unreported conferences in violation of statute offended any federal constitutional guarantee; "Nor have they demonstrated they suffered prejudice from violation of the statute under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . ."].)

We see no basis to conclude that allowing defendant to refuse to testify in plaintiff's case in chief would have been reasonably likely to produce an outcome more favorable to defendant.  The dispositive questions at trial were (1) whether defendant "ha[d] been convicted of a sexually violent offense against one or more victims," and (2) whether he had, at the time of trial, "a diagnosed mental disorder that ma[de] [him] a

30

danger to the health and safety of others in that it [wa]s likely that he . . . [would] engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1); see 6604.) The answer to the first question was a matter of public record as to which there was little if any dispute or doubt. The answer to the second question was largely a matter of expert opinion, as to which the parties presented conflicting testimony from which the jurors were required to choose. Counsel for plaintiff questioned defendant at length about such historical matters as his troubled childhood, but parallel testimony was also elicited from the two psychological experts who evaluated defendant and testified at trial on behalf of plaintiff. To pick a random example, defendant testified that as a youth, he "was really hard to control at home," and that he was at one point placed in a "boy's home" and then a "boy's ranch." One of plaintiff's experts testified without objection that having been made a ward of the court, defendant had been "placed in . . . foster homes and then . . . went to a ranch"—facts supporting a diagnosis of antisocial personality disorder.

Defendant makes no attempt to identify testimony that was received only from him or that was not, and could not have been, elicited from the psychologists.[15] Given that fact, we must assume that all elements of plaintiff's case were amply demonstrated by other witnesses. (See *In re Marriage of Falcone* (2008) 164 Cal.App.4th 814, 822, quoting *Douglas v. Ostermeier* (1991) 1 Cal.App.4th 729, 740 [" ' "The burden is on the appellant, not alone to show error, but to show injury from the error." ' "].)

Moreover defendant ultimately testified on his own behalf, and thus exposed himself to cross-examination on most if not all of the matters covered in his examination

_____

[15] Defendant has raised no issue concerning the foundation for the experts' testimony on these matters. Nor does defendant suggest that they could not rely upon, or relate to the jury, matters derived from interviewing him.

by counsel for plaintiff.[16] It is possible that he would not have taken the stand on his own behalf if he had not already been required to testify, but nothing in this record lends substance to that possibility. For one thing, the testimony of plaintiff's psychological witnesses established that defendant had not been participating in the kind of treatment they considered necessary to reduce the risk of reoffending. This was substantially corroborated by two psychologists called by defendant. The first acknowledged that when he spoke to defendant some two years before trial, defendant said "he thought his risk to re-offend was absolutely zero and there was not a chance in hell he would re-offend." Defendant did not believe he needed sex offender treatment and did not intend to seek it even if released into the community. These statements, the witness observed, resembled those defendant had made almost 30 years earlier while confined in a state hospital after his first apprehension for sexually abusing a minor.

Defendant's second psychological witness confirmed that defendant had "not received sex offender specific treatment at all up until this point." He denied that this fact had any bearing on the likelihood of reoffending because studies had been "unable to isolate the effect of sex offender treatment in reducing sexual recidivism." Rather it was one of several "confounding variables" that "cause[d] the recidivism risk to reduce." He also referred to studies showing that when sexual offenders were randomly assigned to treatment and no-treatment groups, "there's not a significant difference in recidivism rates between treated and untreated sex offenders." His opinion, apparently, was that the

---

**16** This fact distinguishes *Cramer v. Tyars, supra,* 23 Cal.3d 131, 139, which defendant cites for the court's discussion of the probative impact of exposing a defendant in an involuntary commitment case to direct observation by the jury. In that case the defendant's words and conduct on the stand were obviously damaging to his interests and it is highly unlikely that his counsel, given the choice, would have permitted him to testify at all.

only reliable indicator of a high risk of reoffending is the subject's having "voiced," or otherwise unmistakably manifested, "a propensity to re-offend sexually." This testimony could hardly be expected to neutralized the impression left by the other three testifying psychologists that defendant had done nothing to interrupt the pattern of behaviors that had led him to offend—and reoffend—in the past. We can discern no way to counteract that impression unless by defendant's own testimony. Indeed defendant attempted to do so by bringing several matters before the jury. First he testified about other therapies to which he had voluntarily submitted, implying that they were equivalent to, and indeed forms of, sex offender treatment. He also insisted that he was no longer attracted to children or teenagers, attributing this to age-related decline in his sex drive and to the desire for a "mutual relationship." Finally he described the officially sanctioned sex offender treatment—the "phase program[s]"—as a "failed program" with a "success rate" of "pretty much zero."

Defendant's testimony failed to produce the desired effect; the jury still found him likely to reoffend. But the fact remains that without some such testimony, the possibility of a favorable verdict would have appeared even more remote. It thus appears likely that the only real effect of the posited error was that defendant testified during the plaintiff's case rather than reserving his testimony entirely for his own case. In any event, nothing in this record raises a substantial likelihood that permitting defendant to refuse to testify in plaintiff's case would have had any effect on the jury's verdict.

Defendant makes some effort to show prejudice, but not by reference to specific matters of record. Instead he relies on the discussion of this point in *Haynie*, *supra*, 116 Cal.App.4th at page 1230, where the court wrote, "By calling the [defendant] in its case-in-chief, the state is essentially saying that his or her testimony is necessary for the state to prove its case. We have no doubt that a [defendant] so compelled to testify is

33

prejudiced under these circumstances." We cannot ascribe to this reasoning. A party's decision to call the opposing party to the stand falls far short of demonstrating that the latter's testimony is "necessary" to proving the proponent's case. A decision to summon one's opponent to the stand may mean no more than that the proponent wishes to control the manner in which potentially damaging testimony is introduced, or to avoid creating the impression that he is reluctant to face such testimony.

The reasoning espoused in *Haynie* would go far to subvert the rule of harmless error as it has been universally understood and applied in the context of a ruling admitting evidence. If the mere attempt to introduce evidence establishes that the evidence is "necessary" to the proponent's case, then a ruling admitting it must invariably be deemed prejudicial to the opponent, for had the proponent been deprived of truly "necessary" evidence, he could not have prevailed, and the objector would necessary have done so. Such a brush paints far too broadly for the fine work required of sound legal analysis. A party's trial tactics are not a reliable guide to what is "necessary" for that party to prevail; they are only a reflection of counsel's best judgment as to what is tactically advantageous to his or her client. It is common for plaintiffs' attorneys to call the opposing party to the stand, if only in the hope of defusing whatever damaging potential they fear that party's testimony may possess—i.e., to steal the defendant's thunder. This is one of the prerogatives enjoyed by plaintiffs in all settings except criminal prosecutions. That the tactic here involved a kind of evidence rendering it generally unavailable in criminal cases—where the defendant need not testify unless and until he elects to do so—hardly changes the calculus necessary to assess its prejudicial effect. All this record shows is that counsel for plaintiff was permitted—erroneously, in defendant's view—to pursue the commonplace strategy of preempting the defendant's initiative in deciding whether to testify. We find nothing in this record to substantiate the

34

necessary premise that in the absence of this posited error, plaintiff would have been substantially less likely to persuade the jury that defendant is an SVP.  We therefore decline to reach the underlying question whether it was in fact error to require defendant to testify.  We do so, however, in the hope that the California Supreme Court will elect to provide guidance on this fractious question.

### DISPOSITION

The order of commitment is affirmed.


_____
RUSHING, P.J.




WE CONCUR:




_____
PREMO, J.




_____
ELIA, J.